# United States Court of Appeals for the Federal Circuit

---

(Opposition No. 91170112)

**COACH SERVICES, INC.,**
*Appellant,*

**v.**

**TRIUMPH LEARNING LLC,**
*Appellee.*

---

2011-1129

---

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board.

---

Decided: February 21, 2012

---

NORMAN H. ZIVIN, Cooper & Dunham, LLP, of New York, New York, argued for appellant. With him on the brief was TONIA A. SAYOUR.

R. DAVID HOSP, Goodwin Procter, LLP, of Boston, Massachusetts, argued for appellee. With him on the brief was ANTHONY H. CATALDO. Of counsel was JOHN T. BENNETT.

---

Before NEWMAN, O'MALLEY, and REYNA, *Circuit Judges.*

O'MALLEY, *Circuit Judge*.

Coach Services, Inc. ("CSI") appeals from the final decision of the Trademark Trial and Appeal Board ("the Board") dismissing its opposition to Triumph Learning, LLC's ("Triumph") use-based applications to register the mark COACH for educational materials used to prepare students for standardized tests. The Board found that: (1) there was no likelihood of confusion between the parties' COACH marks; (2) CSI failed to prove likelihood of dilution; and (3) although Triumph's marks are merely descriptive, they have acquired secondary meaning, and thus are entitled to registration. *Coach Services, Inc. v. Triumph Learning LLC*, 96 U.S.P.Q.2d 1600 (T.T.A.B. Sept. 17, 2010) ("Board Decision"). For the reasons discussed below, we find no error in the Board's decisions regarding likelihood of confusion and dilution, and thus affirm as to those grounds. With respect to the Board's acquired distinctiveness analysis, however, we find that certain evidentiary errors require us to vacate and remand solely with respect to the Board's determination of Triumph's "substantially exclusive and continuous use" of its marks. Accordingly, we affirm-in-part, vacate-in-part, and remand this matter for further proceedings.

BACKGROUND

A. Triumph's Use of the COACH Mark

Triumph publishes books and software used to assist teachers and students in preparing for standardized tests. Triumph claims that it has used the COACH mark in connection with its products since at least 1986. According to Triumph: (1) the "market for test preparation materials for state-sponsored standardized tests is highly specific and targeted"; and (2) much of the marketing takes place through face to face contact with sales representatives or in the form of direct mailings to previously

identified educational department heads. Appellee's Br. 6.

Triumph explains that, when Congress passed the No Child Left Behind Act in 2001, which mandated that all states administer standardized tests to monitor academic advancement, Triumph made additional investments in its marketing. It began focusing on the style of its brand and developed a mascot – a cartoon coach – and a slogan: "America's best for student success." Triumph invested significantly in its marketing efforts, and, according to Triumph, it has had substantial commercial success selling products under its COACH mark.

In December 2004, Triumph filed use-based applications for three marks: (1) the COACH word mark (Serial No. 78/535,642); (2) a stylized COACH mark (Serial No. 78/536,065); and (3) a COACH mark and design (Serial No. 78/536,143) (referred to collectively as "Triumph's COACH marks"). The COACH mark with a design appears as follows:



Each of the applications is for the following goods in International Classes 9 and 16:

> Computer software for use in child and adult education, namely, software to assist teachers and students at all levels in mastering standards-based curricula and in preparing for standardized

exams; prerecorded audio and video tapes in the field of child and adult education, featuring materials to assist teachers and students at all levels in mastering standards-based curricula and in preparing for standardized exams, in Class 9; and

Printed materials in the field of child and adult education, namely, textbooks, workbooks, teacher guides and manuals, posters and flashcards, all featuring materials to assist teachers and students at all levels in mastering standards-based curricula and in preparing for standardized exams, in Class 16.

Triumph's COACH marks were published for opposition on September 20, 2005.

## B.  CSI's COACH Marks

CSI advertises and sells a wide variety of "accessible luxury" products, including handbags, luggage, clothing, watches, eye glasses, and wallets.  It has been using the COACH mark in connection with its products since at least December 28, 1961.[1]  CSI owns sixteen incontestable trademark registrations for the COACH mark, all but one of which issued before Triumph's applications were filed in December 2004.

CSI sells its COACH products in its own 400 retail stores, in department stores, and over the Internet through its website.  It also promotes its goods by catalogs.  CSI advertises and markets its COACH line of products throughout the United States using "magazine and newspaper ads, billboards and bus and phone kiosks." Appellant's Br. 5.  For example, CSI's COACH brand products have been advertised in national fashion publi-

---

[1]    CSI claims that its predecessor first began using the COACH mark in 1957.

cations, including *Elle*, *Vogue*, *Mademoiselle*, and *Vanity Fair*.

Although CSI's briefing to this court includes advertising and sales figures from 2000-2008, including a representation that its sales exceeded $10 billion over that time frame, as discussed below, this evidence was not properly submitted to the Board and thus was not considered. In fact, the Board found that CSI introduced evidence of its advertising and sales only for 2008. Specifically, CSI introduced the testimony deposition of Carole P. Sadler, the former Vice President, General Counsel, and Secretary of CSI, who testified that, in 2008: (1) CSI's annual sales were roughly $3.5 billion; and (2) CSI spent about "30-60 million a year" on advertising. Joint Appendix ("J.A.") 3659-60.

To further support the popularity and commercial success of its COACH mark, CSI points to: (1) its joint marketing efforts with other popular brands, including LEXUS and CANON; (2) unsolicited media attention from the fashion press; (3) an internal market study conducted in June and July 2007 of persons between the ages of 18-24, which showed that the COACH brand had 96% aided awareness; and (4) the fact that CSI has taken steps to enforce its trademark rights against past infringers.

It is undisputed that CSI is not in the education or test-preparation industry, does not consider Triumph a competitor, and did not present any evidence of any actual confusion stemming from Triumph's use of the Coach mark in conjunction with its educational materials.

## C. TTAB Opposition Proceedings

On March 17, 2006, CSI filed a Notice of Opposition opposing registration of all three of Triumph's COACH marks on grounds of likelihood of confusion under 15

U.S.C. § 1052(d) and dilution under 15 U.S.C. § 1125(c). On October 5, 2006, CSI amended its Notice to add a claim that COACH is merely descriptive when used on goods in the educational and test preparation industries, such that the mark is not registrable to Triumph pursuant to 15 U.S.C. § 1052(e).

On September 17, 2010, the Board issued a judgment dismissing CSI's opposition. Specifically, the Board found that there was: (1) no likelihood of confusion between the parties' marks; and (2) no likelihood of dilution of CSI's COACH mark for lifestyle goods by Triumph's COACH marks for educational materials. While the Board found that CSI's COACH mark was famous for likelihood of confusion purposes, it concluded that CSI failed to provide sufficient evidence of fame to support its dilution claim under the Trademark Dilution Revision Act of 2006 ("TDRA"), 15 U.S.C. § 1125(c). Finally, the Board held that, although Triumph's COACH marks were merely descriptive, they had acquired secondary meaning and thus were entitled to registration.

CSI timely appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(B).

### STANDARD OF REVIEW

We review the Board's legal conclusions *de novo* and its factual findings for substantial evidence. *In re Pacer Tech.*, 338 F.3d 1348, 1349 (Fed. Cir. 2003). Substantial evidence is "'more than a mere scintilla' and 'such relevant evidence as a reasonable mind would accept as adequate' to support a conclusion." *Id.* (quoting *Consol. Edison v. Nat'l Labor Relations Bd.*, 305 U.S. 197, 229 (1938)).

## DISCUSSION

CSI's primary arguments on appeal fall into three categories. It argues that the Board erred when it: (1) improperly balanced the factors set forth in *In re E.I. DuPont de Nemours & Co.*, 476 F.2d 1357, 1361 (C.C.P.A. 1973), to find no likelihood of confusion; (2) ignored substantial evidence showing that CSI's COACH mark was famous for dilution purposes, including corporate annual reports that CSI had attempted to introduce via a notice of reliance; and (3) found that Triumph's descriptive COACH marks have acquired distinctiveness.

In response, Triumph argues that the Board correctly found: (1) no likelihood of confusion "in light of the vast differences in the parties' respective goods, the channels of trade through which those goods are sold, and the vastly different commercial impressions made by the marks on consumers"; (2) no likelihood of dilution because CSI did not meet the stringent standards for fame under the TDRA and because "its mark has not become the principal meaning of the word 'coach'"; and (3) that Triumph's marks have attained secondary meaning. Appellee's Br. 12-13.

For the reasons set forth below, we find Triumph's arguments regarding likelihood of confusion and likelihood of dilution well-taken. Because we find that the Board made evidentiary errors with respect to its acquired distinctiveness analysis, we vacate that portion of the Board's decision and remand for further proceedings on that issue alone.

### A. Evidentiary Ruling Regarding CSI's Notice of Reliance

On appeal, CSI takes issue with the Board's decision to exclude the corporate annual reports it attempted to admit through a notice of reliance. According to CSI, the

Board should have considered its 2000-2008 annual reports as evidence of CSI's annual sales figures and the amount it expended in advertising, design, and promotion of its COACH products. In response, Triumph argues that the Board properly struck the documents from the record because they were not submitted in accordance with the Board's rules and were not otherwise authenticated. We agree with Triumph.

This court reviews evidentiary rulings for abuse of discretion. *Crash Dummy Movie, LLC v. Mattel, Inc.*, 601 F.3d 1387, 1390 (Fed. Cir. 2010) (citing *Chen v. Bouchard*, 347 F.3d 1299, 1307 (Fed. Cir. 2003)). We will reverse only if the Board's evidentiary ruling was: (1) "clearly unreasonable, arbitrary, or fanciful"; (2) "based on an erroneous conclusion[] of law"; (3) premised on "clearly erroneous findings of fact"; or (4) the record "contains no evidence on which the Board could rationally base its decision." *Id.* at 1390-91.

The Trademark Rules of Practice, which govern inter partes trademark proceedings before the Board, provide, in part, that "printed publications" which are "available to the general public in libraries or of general circulation among members of the public or that segment of the public which is relevant under an issue in a proceeding . . . may be introduced in evidence by filing a notice of reliance on the material being offered." 37 C.F.R. § 2.122(e). Historically, corporate annual reports were not considered printed publications available to the general public and thus were not admissible via a notice of reliance without any authentication. *See Jeanne-Marc, Inc. v. Cluett, Peabody & Co., Inc.*, 221 U.S.P.Q. 58, 59, n.4 (T.T.A.B. 1984) ("It is well settled that annual reports do not fall within the category of printed publications as contemplated" under the Trademark Rules.); *see also Midwest Plastic Fabricators Inc. v. Underwriters Labs. Inc.*, 12

U.S.P.Q.2d 1267, 1270 n.5 (T.T.A.B. 1989) ("[P]rinted material in the nature of annual reports is not considered printed publications available to the general public such that it may be relied on pursuant to Rule 2.122(e). Rather, such material must be introduced in connection with the deposition testimony of a competent witness."); *VTech Holdings Ltd. v. Varian Semiconductor Equip. Assocs., Inc.*, Opp. No. 91156936, 2007 TTAB LEXIS 245, at *11 (T.T.A.B. Sept. 21, 2007) ("Opposer's corporate annual reports, newsletters and other house publications are not self-authenticating printed publications or official records and may not be made of record by notice of reliance. We sustain applicant's objection to all such documents and shall give them no consideration.") (internal citations omitted).

In a 2010 decision, however, the Board expanded the types of documents that can be introduced by way of a notice of reliance. *Safer Inc. v. OMS Investments Inc.*, 94 U.S.P.Q.2d 1031, 1039 (T.T.A.B. 2010). In *Safer*, the Board held that:

> *if a document obtained from the Internet identifies its date of publication or date that it was accessed and printed, and its source* (e.g., the URL), it may be admitted into evidence pursuant to a notice of reliance in the same manner as a printed publication in general circulation in accordance with Trademark Rule 2.122(e). . . The Board will henceforth deem a document obtained from the Internet displaying a date and its source as presumptively true and genuine. Of course, the document must be publicly available. The date and source information on the face of Internet documents allow the nonoffering party the opportunity to verify the documents.

*Id.* (emphasis in original). In a footnote, the Board recognized that documents could be treated differently depending on their format. For example, "a corporate annual report available only in paper form may not be admissible through a notice of reliance because it is not a document in general circulation," while a report "in digital form publically available over the Internet would be admissible through a notice of reliance because its publication on the Internet places it in general circulation." *Id.* at 1039 n.18.

Here, CSI's First Notice of Reliance, which was dated October 20, 2008, listed its annual reports from 2002 to 2008.[2] Triumph objected on grounds that "annual reports may not be introduced through a notice of reliance, but must be introduced and authenticated by competent testimony." *Board Decision*, 96 U.S.P.Q.2d at 1603. The Board, relying on Trademark Rule 2.122(e) and the related cases cited above, indicated that "corporate annual reports are not considered to be printed publications available to the general public." *Id.* In a footnote, the Board acknowledged the recent *Safer* decision and found that, "[b]ecause the annual reports were not printed from the Internet, they may not be admitted into evidence pursuant to a notice of reliance." *Id.* at 1603 n.2 (citing *Safer*, 94 U.S.P.Q.2d at 1039 n.18). The Board further noted that CSI did not have any witness testify to the authenticity of the reports. Accordingly, the Board sustained Triumph's objection and gave CSI's annual reports no consideration.

---

[2] Although its Notice of Reliance listed its annual reports for 2002-2008, in its briefing, CSI argues that the Board should have considered its annual reports from 2001 to 2008. This discrepancy is irrelevant, however, given the Board's decision to exclude all of the reports on grounds that they were improperly introduced.

On appeal, CSI argues that the Board should have considered the annual reports in light of the *Safer* decision. According to CSI, because its annual reports from 2001 to 2008 were available online, the Board should have accepted the printed versions of the reports. In the alternative, CSI argues that, if the court agrees with the Board that the paper versions of the annual reports are not admissible via a notice of reliance, but that "identical copies printed off the Internet are admissible, Coach submitted the testimony of its Vice President and General Counsel that Coach's sales and advertising information is reported publicly because it is a public company." Appellant's Br. 29-30.

The record reveals that CSI's former Vice President and General Counsel – Carole Sadler – testified as follows:

Q. About how much does Coach spend on advertising every year?

A. Currently we spend about 30 to $60 million a year. If you include design and promotional expenditures with advertising, it is closer to 125 million.

Q. Annually?

A. Annually, yes.

Q. And is that information available publicly?

A. Yes, it is in our annual report.

Q. What are Coach's sales approximately today?

A. About three-and-a-half billion dollars.

Q. Is that information available publicly?

A. Yes.

Q. Is Coach a public company?

A. Yes.

Q. So it reports that information publicly?

A. Yes.

J.A. 3659-60. According to CSI, this testimony corroborates that the advertising spending and sales figures from 2000 to 2008 are publicly available through the annual reports CSI proffered. It is undisputed, however, that Ms. Sadler was not shown the annual reports during her deposition and did not authenticate the documents at issue.

Despite CSI's contentions to the contrary, we find that the Board's decision to exclude the annual reports is consistent with both the Trademark Rules and the Board's related case law. It is significant, moreover, that CSI submitted its Notice of Reliance in October 2008, and the Board did not decide *Safer* until 2010. At the time the Notice of Reliance was submitted, therefore, the Board's rules and existing case law were clear that corporate annual reports were not admissible via a notice of reliance. Even under the Board's *Safer* decision, moreover, CSI's printed versions of its annual reports could not be admitted into evidence pursuant to a notice of reliance because they lacked identifying information such as the online source and date accessed. Indeed, *Safer* specifically contemplated this situation where a corporate annual report is "inadmissible in paper form by way of a notice of reliance because it is not a document in general circulation whereas the same annual report in digital form, publicly available over the internet, would be admissible through a notice of reliance because its publication on the internet places it in general circulation." Gary D. Krugman, *Trademark Trial & App. Board Prac. & Proc.* § 3.138 (2011).

With respect to Ms. Sadler's testimony, the Board found that her statements were limited to 2008 because she specified that her sales and advertising estimates were "current" estimates, and her deposition was taken in 2008. And, as Triumph notes and CSI concedes, the sales figure Ms. Sadler quoted during her testimony was for worldwide sales, not sales within the United States, and there was no indication as to whether the advertising figures quoted were limited to the United States. Simply put, there was no testimony authenticating the annual reports or independently establishing the information contained therein.

Although the Board's requirements for admission of evidence via a notice of reliance are specific, and do not mirror the Federal Rules of Evidence, they can be readily learned and easily satisfied. Because CSI offered only paper versions of its annual reports, which are not self-authenticating, we find that the Board did not abuse its discretion when it excluded those reports. Accordingly, we affirm the Board's evidentiary ruling.

### B.  Likelihood of Confusion

Next, CSI argues that the Board erred in finding no likelihood of confusion under the factors articulated in *DuPont*. Likelihood of confusion is a legal determination based on underlying facts. *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 945 (Fed. Cir. 2000); *see also M2 Software, Inc. v. M2 Commc'ns, Inc.*, 450 F.3d 1378, 1381 (Fed. Cir. 2006) ("Likelihood of confusion is a question of law, based on findings of relevant underlying facts, namely findings under the *DuPont* factors."). Although we review the Board's findings as to the *DuPont* factors for substantial evidence, we review its overall determination of likelihood of confusion without deference. *In re Chatam Int'l Inc.*, 380 F.3d 1340, 1342 (Fed. Cir. 2004)

Under Section 2(d) of the Lanham Act, the Patent and Trademark Office ("PTO") may refuse to register a trademark if it is so similar to a registered mark "as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive."   15 U.S.C. § 1052(d).   Whether a likelihood of confusion exists between an applied-for mark and a prior mark is determined on a case-by-case basis applying the thirteen non-exclusive factors set forth in *DuPont*.[3]

---

[3]    The *DuPont* factors include:

(1) The similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression. (2) The similarity or dissimilarity and nature of the goods or services as described in an application or registration or in connection with which a prior mark is in use. (3) The similarity or dissimilarity of established, likely-to-continue trade channels. (4) The conditions under which and buyers to whom sales are made, i.e., "impulse" vs. careful, sophisticated purchasing. (5) The fame of the prior mark (sales, advertising, length of use). (6) The number and nature of similar marks in use on similar goods. (7) The nature and extent of any actual confusion. (8) The length of time during and conditions under which there has been concurrent use without evidence of actual confusion. (9) The variety of goods on which a mark is or is not used (house mark, "family" mark, product mark). (10) The market interface between applicant and the owner of a prior mark . . . . (11) The extent to which applicant has a right to exclude others from use of its mark on its goods. (12) The extent of potential confusion, i.e., whether de minimis or substantial. (13) Any other established fact probative of the effect of use.

*DuPont*, 476 F.2d at 1361.

*Citigroup Inc. v. Capital City Bank Group, Inc.*, 637 F.3d 1344, 1349 (Fed. Cir. 2011) (citation omitted). "Not all of the *DuPont* factors are relevant to every case, and only factors of significance to the particular mark need be considered." *In re Mighty Leaf Tea*, 601 F.3d 1342, 1346 (Fed. Cir. 2010). For example, the Board can "focus . . . on dispositive factors, such as similarity of the marks and relatedness of the goods." *Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 1164 (Fed. Cir. 2002) (citation omitted).

Here, the Board focused on the following *DuPont* factors: (1) the strength or fame of CSI's COACH marks; (2) the similarity of the goods; (3) the channels of trade; (4) the classes of consumers; and (5) the similarity of the marks in their entireties. The Board weighed each of these factors and found that there was no likelihood of confusion because the parties' marks "have different meanings and engender different commercial impressions," and the goods involved "are not similar or related in any way." *Board Decision*, 96 U.S.P.Q.2d at 1609.

CSI argues that the Board failed to give proper weight to: (1) the fame of its COACH mark; (2) the identical nature of the parties' marks; and (3) the "overlap between the parties' goods and the overlap and lack of sophistication of the parties' customers." Appellant's Br. 19. We address each of the challenged determinations in turn and find that they are supported by substantial evidence. After careful review and balancing of the *DuPont* factors, we conclude that the Board correctly found no likelihood of confusion.

### 1. Strength or Fame of CSI's Coach Mark

The fame of the registered mark plays a "dominant" role in the *DuPont* analysis, as famous marks "enjoy a wide latitude of legal protection." *Recot, Inc. v. M.C.*

*Becton*, 214 F.3d 1322, 1327 (Fed. Cir. 2000); *see also Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 1374 (Fed. Cir. 2005) ("[A] strong mark . . . casts a long shadow which competitors must avoid") (citation omitted)). A famous mark is one that has "extensive public recognition and renown." *Bose Corp. v. QSC Audio Prods. Inc.*, 293 F.3d 1367, 1371 (Fed. Cir. 2002) (citation omitted).

Fame for purposes of likelihood of confusion is a matter of degree that "varies along a spectrum from very strong to very weak." *Palm Bay*, 396 F.3d at 1375 (quoting *In re Coors Brewing Co.*, 343 F.3d 1340, 1344 (Fed. Cir. 2003)). Relevant factors include sales, advertising, length of use of the mark, market share, brand awareness, licensing activities, and variety of goods bearing the mark. *Recot*, 214 F.3d at 1326; *see also Bose*, 293 F.3d at 1371 ("[O]ur cases teach that the fame of a mark may be measured indirectly, among other things, by the volume of sales and advertising expenditures of the goods traveling under the mark, and by the length of time those indicia of commercial awareness have been evident."). The party asserting that its mark is famous has the burden to prove it. *Leading Jewelers Guild, Inc. v. LJOW Holdings, LLC*, 82 U.S.P.Q.2d 1901, 1904 (T.T.A.B. 2007) ("It is the duty of a party asserting that its mark is famous to clearly prove it.").

It is well-established that fame is insufficient, standing alone, to establish likelihood of confusion. *Univ. of Notre Dame Du Lac .v J.C. Gourmet Food Imports Co., Inc.*, 703 F.2d 1372, 1374 (Fed. Cir. 1983) ("Likely . . . to cause confusion means more than the likelihood that the public will recall a famous mark on seeing the same mark used by another.") (internal quotations omitted). Although fame cannot overwhelm the other *DuPont* factors, we are mindful that it "deserves its full measure of weight

in assessing likelihood of confusion." *Recot*, 214 F.3d at 1328 (noting that "fame alone cannot overwhelm the other *DuPont* factors as a matter of law").

To show the strength and fame of its mark, CSI introduced the following evidence before the Board:

- CSI began using the COACH mark at least as early as December 28, 1961.

- There are approximately 400 COACH retail stores throughout all 50 states.

- CSI's COACH products are sold by approximately 1,000 third-party retailers throughout the US.

- In 2008, CSI's annual sales were roughly $3.5 billion.

- In 2008, CSI spent "about $30-60 million a year" on advertising.

- CSI has advertised in magazines such as Elle, Vogue, Vanity Fair, and The New Yorker.

- CSI has advertised in newspapers in major metropolitan areas.

- CSI's COACH products have received unsolicited publicity from newspapers and magazines discussing fashion trends.

- CSI has been the subject of articles that refer to the renown of its products.

- CSI's internal brand awareness study, which issued in March 2008, showed a high level of awareness of the COACH brand for women between the ages of 13-24.

- CSI's COACH products are the subject of counterfeiting.

Based on this evidence, the Board found that CSI's COACH mark is famous for purposes of likelihood of confusion. Substantial evidence supports this finding. As discussed below, however, the Board found that the other factors, on balance, dispel any likelihood of confusion between the parties' marks.

### 2. Similarity of the Marks

Under the next *DuPont* factor, the Board must consider the "similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression." 476 F.2d at 1361. CSI argues that the substantial similarity of the marks should have weighed heavily in favor of likelihood of confusion. Triumph responds that, although the marks for both companies contain the word "Coach," "when viewed in their commercial contexts, together with the relevant designs and in connection with their respective goods, they convey entirely different commercial impressions." Appellee's Br. 36-37.

It is well-established that it is improper to dissect a mark, and that marks must be viewed in their entireties. *In re Shell Oil Co.*, 992 F.2d 1204, 1206 (Fed. Cir. 1993) ("The marks are considered in their entireties, words and design."); *see also Sports Auth. Mich., Inc. v. PC Auth., Inc.*, 63 U.S.P.Q.2d 1782, 1792 (T.T.A.B. 2002) (same). In some circumstances, however, "one feature of a mark may be more significant than another, and it is not improper to give more weight to this dominant feature in determining the commercial impression created by the mark." *Leading Jewelers Guild*, 82 U.S.P.Q.2d at 1905; *see also In re Nat'l Data Corp.*, 753 F.2d 1056, 1058 (Fed. Cir. 1985) ("[T]here is nothing improper in stating that, for rational reasons, more or less weight has been given to a particu-

lar feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties.").

The proper test is not a side-by-side comparison of the marks, but instead "whether the marks are sufficiently similar in terms of their commercial impression" such that persons who encounter the marks would be likely to assume a connection between the parties. *Leading Jewelers Guild*, 82 U.S.P.Q.2d at 1905. In this fact-specific inquiry, if the parties' goods are closely related, a lesser degree of similarity between the marks may be sufficient to give rise to a likelihood of confusion. *In re Inca Textiles, LLC*, 344 Fed. Appx. 603, 606 (Fed. Cir. 2009) (citing *Century 21 Real Estate Corp. v. Century Life of Am.*, 970 F.2d 874, 877 (Fed. Cir. 1992)). Even where the marks at issue are identical, or nearly identical, the Board has found that differences in connotation can outweigh visual and phonetic similarity. *See Blue Man Prods. Inc. v. Tarmann*, 75 U.S.P.Q.2d 1811, 1820-21 (T.T.A.B. 2005) (finding that BLUE MAN GROUP "has the connotation of the appearance of the performers" and that applicant's BLUEMAN mark "has no such connotation for cigarettes or tobacco. Thus, the marks differ in their connotations and commercial impressions"); *see also In re Sears, Roebuck & Co.*, 2 U.S.P.Q.2d 1312, 1314 (T.T.A.B. 1987) (considering CROSSOVER for brassieres and CROSSOVER for ladies' sportswear and finding that, "[a]s a result of their different meanings when applied to the goods of applicant and registrant, the two marks create different commercial impressions, notwithstanding the fact that they are legally identical in sound and appearance").

Here, the Board found that, although the marks are identical in terms of sight and sound, they differ as to connotation and commercial impression. The Board stated that, in assessing connotation and commercial

impression, "we are compelled to consider the nature of the respective goods and services." *Board Decision*, 96 U.S.P.Q.2d at 1609 (citing *TBC Corp. v. Holsa, Inc.*, 126 F.3d 1470 (Fed. Cir. 1997)). Applying this analysis, the Board found that:

> Opposer's COACH mark, when applied to fashion accessories is clearly either arbitrary or suggestive of carriage or travel accommodations (e.g., stagecoach, train, motor coach, etc.) thereby engendering the commercial impression of a traveling bag (e.g., a coach or carriage bag). On the other hand, applicant's COACH marks call to mind a tutor who prepares a student for an examination.

*Id.* Given the "completely different meanings and commercial impressions engendered by the marks," the Board concluded that Triumph's COACH marks are not similar to CSI's COACH mark. *Id.*

As noted, Triumph's applications seek to register COACH in standard character form, COACH in a stylized font, and COACH with a mascot and the tagline "America's Best for Student Success." It is undisputed that the word marks for both parties are identical in sound and appearance: they both use the word "Coach." This fact is significant to the similarity inquiry. We, nevertheless, agree with the Board that, despite their undisputed similarity, the marks have different meanings and create distinct commercial impressions. This is particularly true given that the word "coach" is a common English word that has many different definitions in different contexts.

Specifically, we find that substantial evidence supports the Board's determination that Triumph's COACH mark, when applied to educational materials, brings to mind someone who instructs students, while CSI's

COACH mark, when used in connection with luxury leather goods, including handbags, suitcases, and other travel items, brings to mind traveling by carriage. We agree with the Board that these distinct commercial impressions outweigh the similarities in sound and appearance, particularly since, as discussed below, the parties' goods are unrelated. *See Blue Man Prods.*, 75 U.S.P.Q.2d at 1820-21 ("We consider these differences in the connotations and the commercial impressions of the marks to outweigh the visual and phonetic similarity."). Accordingly, this factor favors Triumph.

### 3.   Similarity of the Goods

With respect to the *DuPont* factor assessing the similarity of the goods, the Board found, and we agree, that the parties' goods are unrelated. This factor requires a comparison between the goods or services described in the application and those described in the registration. *See M2 Software*, 450 F.3d at 1382 (noting that, when reviewing the relatedness of the goods, this court considers "the applicant's goods as set forth in its application, and the opposer's goods as set forth in its registration").

When analyzing the similarity of the goods, "it is not necessary that the products of the parties be similar or even competitive to support a finding of likelihood of confusion." *7-Eleven Inc. v. Wechsler*, 83 U.S.P.Q.2d 1715, 1724 (T.T.A.B. 2007). Instead, likelihood of confusion can be found "if the respective products are related in some manner and/or if the circumstances surrounding their marketing are such that they could give rise to the mistaken belief that they emanate from the same source." *Id.* When trademarks would appear on substantially identical goods, "the degree of similarity necessary to support a conclusion of likely confusion declines." *Citigroup Inc. v. Capital City Bank Group, Inc.*, 637 F.3d 1344, 1355 (Fed.

Cir. 2011) (citing *Century 21 Real Estate*, 970 F.2d at 877).

The Board found "clear and significant differences" between the parties' goods. *Board Decision*, 96 U.S.P.Q.2d at 1608. While Triumph's applications identify computer software and printed materials for use in preparing students for standardized exams, the various products identified in CSI's registrations include handbags, fashion accessories, luggage, and clothing. The Board further noted that, although CSI uses its mark on many different types of goods, it does not use COACH on educational products.

On appeal, CSI concedes that the parties' products are not the same, but contends that there is some overlap between their goods because it "has used the mark in connection with books and audio and videotapes and in connection with tote bags, caps and shirts." Appellant's Br. 49. This alleged overlap does not help CSI's position, however, particularly since there is no evidence in the record regarding the sales or marketing of these items.[4]

---

[4] As Triumph correctly points out, CSI provided no evidence as to the sales of these books, any marketing efforts, when the books were last sold, or whether CSI generated revenue from the books. For example, during Ms. Sadler's deposition, she testified that CSI has published books about its history including a book called "Portrait of a Leather Goods Factory." J.A. 3647. On cross-examination, however, Ms. Sadler could not provide any information regarding the sales of this book or whether it was even sold by CSI. J.A. 3675-76. With respect to CSI's "audio and video tapes," the record reveals that these are materials it prepares and provides to U.S. Customs to intercept counterfeit goods. There is no evidence that CSI sells these tapes.

Finally, although CSI argues that the parties' products are related because Triumph uses its marks on shirts, caps, and tote bags, the Board correctly noted that Triumph's applications do not seek to register its COACH marks for those items, and likelihood of confusion must be based on the goods identified in the application. *Board Decision*, 96 U.S.P.Q.2d at 1608. And, there is no evidence that Triumph sells these products, which, according to Triumph, are worn by its sales agents to market Triumph's test preparation materials.

Based on the foregoing, substantial evidence supports the Board's conclusion that the parties' goods are not related.

### 4.   Channels of Trade and Classes of Customers

Next, we consider the similarity or dissimilarity of the trade channels in which the parties' goods are sold and the purchasers to whom the parties' goods are marketed. The Board correctly recognized that, because Triumph's description of goods is not limited to sales to educational professionals, the goods are presumed to travel in all normal channels and to all prospective purchasers for the relevant goods. *See Packard Press, Inc. v. Hewlett-Packard Co.*, 227 F.3d 1352, 1360-61 (Fed. Cir. 2000) ("When the registration does not contain limitations describing a particular channel of trade or class of customer, the goods or services are assumed to travel in all normal channels of trade.").

With respect to the trade channels, the Board noted that CSI sells its products through its 400 retail stores and through third-party retailers. It also advertises in newspapers, fashion magazines, and catalogs that target female consumers between the ages of 25-65 in all income brackets. For its part, Triumph markets its products

through catalogs, direct mail, and personal sales representatives.

With respect to the classes of customers, CSI argues that customers of both products are ordinary consumers, including teachers, "who may buy the products at issue without a great deal of thought." Appellant's Br. 48. The Board found, however, that Triumph targets educational professionals with responsibility for purchasing educational materials. The Board further found that, although educational professionals "may include females between the ages of 25-65," the products are "not sold under circumstances likely to give rise to the mistaken belief that the products emanate from the same source." *Board Decision*, 96 U.S.P.Q.2d at 1608. In fact, the Board found that educational professionals are likely to exercise a high level of care in making purchasing decisions, which would minimize likelihood of confusion.

Under these circumstances, the Board did not err in concluding that the goods are not related and the channels of trade are distinct. Although there could be some overlap in the classes of purchasers for the parties' products, we agree it is unlikely that, in the circumstances in which the products are sold, customers would associate CSI's COACH brand products with educational materials used to prepare students for standardized tests. And, there is nothing in the record to suggest that a purchaser of test preparation materials who also purchases a luxury handbag would consider the goods to emanate from the same source. *See Sports Auth. Mich.*, 63 U.S.P.Q.2d at 1794 ("There is nothing in the record, however, to suggest that merely because the same consumer may purchase these items, such consumer would consider the goods as likely to emanate from the same source or have the same sponsorship."). Accordingly, substantial evidence supports the Board's decision that this factor favors Triumph.

### 5.   Balancing the *DuPont* Factors

The Board found that two of the *DuPont* factors weighed in favor of CSI, in whole or in part: (1) CSI's COACH mark is famous for likelihood of confusion; and (2) the classes of consumers may overlap. In contrast, the Board found that the following factors weighed in favor of Triumph: (1) the goods of the parties are not similar or related; (2) the goods move in different trade channels; (3) the marks used by the parties have different meanings and engender different commercial impressions; and (4) Triumph markets to sophisticated purchasers.[5] After balancing these factors, the Board determined that no likelihood of confusion would arise between the parties' marks.

On appeal, CSI argues that the Board should have given more weight to its determination that its COACH mark was famous. As the Board correctly found, however, fame, while important, is insufficient standing alone to establish likelihood of confusion. On the record before us, and after weighing the relevant *DuPont* factors *de novo*, we agree with the Board that customer confusion is not likely between the parties' respective COACH marks. Although CSI's COACH mark is famous for likelihood of confusion purposes, the unrelated nature of the parties' goods and their different channels of trade weigh heavily against CSI. Absent overlap as to either factor, it is difficult to establish likelihood of confusion. Because the *DuPont* factors favoring Triumph outweigh the factors

---

[5]   Although the Board did not make any explicit findings on these *DuPont* factors, Triumph also points out that: (1) CSI provided no evidence of actual confusion between the marks; and (2) there was more than 20 years of concurrent use.

favoring CSI, the Board was correct in finding no likelihood of confusion.

## C.  Dilution

The TDRA, which was signed into law on October 6, 2006, amended Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).  It provides that:

> the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c)(1).  Therefore, to prevail on a dilution claim under the TDRA, a plaintiff must show that: (1) it owns a famous mark that is distinctive; (2) the defendant is using a mark in commerce that allegedly dilutes the plaintiff's famous mark; (3) the defendant's use of its mark began after the plaintiff's mark became famous; and (4) the defendant's use of its mark is likely to cause dilution by blurring or by tarnishment.

The TDRA defines dilution by blurring as an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark."  15 U.S.C. § 1125(c)(2)(B).  Dilution by tarnishment is defined as "an association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark."  15 U.S.C. § 1125(c)(2)(C).

In its Opposition, CSI argued that Triumph's marks would blur the distinctiveness of its COACH mark and tarnish its reputation. On appeal, however, CSI abandons its dilution by tarnishment claim and focuses its arguments solely on blurring.[6] The Board found that CSI could not succeed on its dilution claims because it failed to show that its COACH mark was famous for dilution purposes. For the reasons explained below, we agree. Because we find that CSI failed to prove fame for dilution, we need not address the other statutory factors courts can consider to determine whether a mark is likely to cause dilution by blurring.

### 1. Fame for Dilution

A threshold question in a federal dilution claim is whether the mark at issue is "famous." Under the TDRA, a mark is famous if it "is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). By using the "general consuming public" as the benchmark, the TDRA eliminated the possibility of "niche fame," which some courts had recognized under the previous version of the statute.[7] *See Top Tobacco, LP v. N. Atl. Operating Co.*, 509 F.3d 380, 384 (7th Cir. 2007) (noting that the reference to the general public "eliminated any possibility of 'niche fame,' which

---

[6] During oral argument, counsel for CSI specifically indicated that CSI is not pursuing a tarnishment claim on appeal. *See* Oral Argument at 0:49, *available at* http://www.cafc.uscourts.gov/oral-argument-recordings/2011-1129/all ("We are not pursuing a tarnishment claim on appeal . . . we are going to limit it to blurring.").

[7] The previous version of the statute, prior to the 2006 revision, was the Federal Trademark Dilution Act of 1995 or "FTDA."

some courts had recognized before the amendment"). The TDRA lists four non-exclusive factors for courts to consider when determining whether a mark is famous:

(i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

(ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.

(iii) The extent of actual recognition of the mark.

(iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(2)(A). Whether a mark is famous under the TDRA is a factual question reviewed for substantial evidence.

Fame for likelihood of confusion and fame for dilution are distinct concepts, and dilution fame requires a more stringent showing. 4 J. Thomas McCarthy, *McCarthy On Trademark and Unfair Competition* § 24:104 at 24-290 (4th ed. 2011) ("The standard for the kind of 'fame' needed to trigger anti-dilution protection is more rigorous and demanding than the 'fame' which is sufficient for the classic likelihood of confusion test."). While fame for dilution "is an either/or proposition" – it either exists or does not – fame for likelihood of confusion is a matter of degree along a continuum. *Palm Bay*, 396 F.3d at 1374-75. Accordingly, a mark can acquire "sufficient public recognition and renown to be famous for purposes of likelihood of confusion without meeting the more stringent requirement for dilution fame." *7-Eleven*, 83 U.S.P.Q.2d at 1722.

It is well-established that dilution fame is difficult to prove. *See Toro Co. v. ToroHead Inc.*, 61 U.S.P.Q.2d 1164, 1180 (T.T.A.B. 2001) ("Fame for dilution purposes is difficult to prove."); *Everest Capital, Ltd. v. Everest Funds Mgmt. LLC*, 393 F.3d 755, 763 (8th Cir. 2005) ("The judicial consensus is that 'famous' is a rigorous standard."); *see also* 4 *McCarthy*, § 24:104 at 24-286, 24-293 (noting that fame for dilution is "a difficult and demanding requirement" and that, although "all 'trademarks' are 'distinctive' – very few are 'famous'"). This is particularly true where, as here, the mark is a common English word that has different meanings in different contexts. Importantly, the owner of the allegedly famous mark must show that its mark became famous "prior to the filing date of the trademark application or registration against which it intends to file an opposition or cancellation proceeding." *Toro*, 61 U.S.P.Q.2d at 1174.

As noted, fame for dilution requires widespread recognition by the general public. 15 U.S.C. § 1125(c)(2)(A). To establish the requisite level of fame, the "mark's owner must demonstrate that the common or proper noun uses of the term and third-party uses of the mark are now eclipsed by the owner's use of the mark." *Toro*, 61 U.S.P.Q.2d at 1180.[8] An opposer must show that, when the general public encounters the mark "in almost any context, it associates the term, at least initially, with the mark's owner." *Id.* at 1181. In other words, a famous mark is one that has become a "household name." *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1012 (9th Cir. 2004) (quoting *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 911 (9th Cir. 2002)). With this framework in mind, we turn to CSI's evidence of fame.

---

[8]    Although the Board's *Toro* decision predates the TDRA, its discussion of fame for dilution purposes remains relevant.

### 2.   CSI Failed to Introduce Sufficient Evidence of Fame for Dilution

The Board found that CSI's evidence of fame was insufficient to support a dilution claim. On appeal, CSI argues that the same evidence establishing fame for likelihood of confusion also establishes fame for dilution purposes. Specifically, CSI argues that the Board disregarded: (1) sales and advertising figures for years 2000-2008; (2) its sixteen federal trademark registrations; (3) unsolicited media attention; (4) joint marketing efforts; (5) two Second Circuit decisions finding the Coach hangtag, which features the COACH mark, to be famous; and (6) CSI's internal brand awareness survey showing awareness among 18-24 year old consumers. We address each category of evidence in turn. For the reasons set forth below, we find substantial evidence supporting the Board's decision that CSI failed to show the requisite level of fame for dilution.

Turning first to CSI's evidence of sales and advertising expenditures, CSI argues that the Board erred when it ignored the annual reports that were attached to a Notice of Reliance. As previously discussed, however, the Board correctly held that these reports were unauthenticated and thus inadmissible. The only sales and advertising figures in the record via Ms. Sadler's testimony were for one year – 2008 – which, notably, is after Triumph filed its use-based applications in December 2004. We agree with the Board that this limited evidence of sales and advertising is insufficient to show fame. Even if the Board had considered the annual reports, moreover, such evidence, standing alone, would be insufficient. *See Toro*, 61 U.S.P.Q.2d at 1181 ("Merely providing evidence that a mark is a top-selling brand is insufficient to show this general fame without evidence of how many persons are purchasers.").

With respect to CSI's registrations, the Board found that the mere existence of federally registered trademarks is insufficient to show that the mark is famous for purposes of dilution because ownership of a registration is not proof of fame. On appeal, CSI argues that the Board erred in this determination because one of the statutory factors a court can consider in the fame analysis is whether the mark is registered on the principal register. *See* 15 U.S.C. § 1125(c)(2)(A)(iv). As Triumph points out, however, "[o]ne cannot logically infer fame from the fact that a mark is one of the millions on the Federal Register." 4 *McCarthy*, § 24:106 at 24-310. While ownership of a trademark registration *is* relevant to the fame inquiry, and – to the extent the Board decision implies otherwise – the Board erred on this point, proof of registration is not *conclusive* evidence of fame.

With respect to media attention, the Board found that CSI's evidence fell short of showing "widespread recognition of opposer's mark [by] the general population." *Board Decision*, 96 U.S.P.Q.2d at 1611. Specifically, the Board found that:

> the vast majority of unsolicited media recognition for opposer's COACH mark comprises a reference to one of opposer's products as one of many different fashion buys or trends, and the news articles noting opposer's renown are too few to support a finding that opposer's mark has been transformed into a household name.

*Id.* On appeal, CSI argues that the Board ignored hundreds of unsolicited articles mentioning the COACH mark over the years. CSI points to several examples, including the following:

- "In fact, Coach's growth . . . has been phenomenal. When Sara Lee acquired the firm in 1985, its vol-

ume was about $18 million. In Sara Lee's latest fiscal year, which ended last June 30, Coach's sales exceeded $500 million. The name also resonates with consumers. The brand ranked eighth among the top 10 in accessories firms in the latest Fairchild 100 consumer survey of fashion labels, in 1995. J.A. 3607 (Women's Wear Daily, May 5, 1997).

- "Coach, one of the top makers of status handbags in the United States . . ." J.A. 3598 (The New York Times, Jan. 27, 1999).

- "Coach's creative director has helped transform the 60-year old company into a must-have American icon." J.A. 3156 (Women's Wear Daily, June 2001).

- "Will Coach Become Too Popular? . . . Coach, the maker and retailer of stylish handbags, just had a blowout season. . . . Clearly Coach has recorded some of the best growth numbers of any retailer or accessories maker in recent years." J.A. 3543 (Business Week, Jan. 24, 2007).

Looking at the media attention in the record, there is certainly evidence that CSI's COACH mark has achieved a substantial degree of recognition. That said, many of the articles submitted are dated *after* Triumph filed its registration applications and thus do not show that CSI's mark was famous *prior* to the filing date. *See Toro*, 61 U.S.P.Q.2d at 1174 ("an owner of an allegedly famous mark must establish that its mark had become famous prior to the filing date of the trademark application" which it opposes). And, there is substantial evidence supporting the Board's determination that many of the references are limited to mentioning one of CSI's COACH products among other brands. Accordingly, even though

there is some evidence of media attention, substantial evidence supports the Board's conclusion that the media evidence submitted fails to show widespread recognition.

With respect to joint marketing efforts, CSI argued that other popular brands, including LEXUS and CANON, have used the COACH mark in connection with their products. The Board found that CSI "failed to provide any testimony regarding the success of the joint marketing efforts and the effect of those efforts in promoting opposer's mark." *Board Decision*, 96 U.S.P.Q.2d at 1611, n.37. We agree. Without evidence as to the success of these efforts or the terms of any contracts involved, they have little value here.

Next, the Board found that CSI's 2008 brand awareness study was "of dubious probative value" because it did not offer a witness with first-hand knowledge of the study to explain how it was conducted. *Id.* at 1611. The Board further noted that, although the study showed a high level of brand awareness among women ages 13-24, it provided no evidence of brand awareness among women generally, or among men. *See Top Tobacco*, 509 F.3d at 384 (noting that the TDRA eliminated the possibility of "niche fame" as a basis for finding a mark famous). And, the survey was conducted in 2007, several years after Triumph filed its applications. Given these circumstances, we find no error in the Board's decision to give this survey limited weight.

CSI also argues that the Board failed to adequately consider two Second Circuit decisions finding that the hangtag attached to its various handbags, which features the COACH mark, is distinctive. *See Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 166 (2d Cir. 1991) (finding that Coach's lozenge-shaped leather tags embossed with the name "Coach Leatherware," which are

attached to Coach's handbags by beaded brass chains, "have become distinctive and valuable through Coach's promotional efforts and by virtue of its upscale reputation"); *see also Coach, Inc. v. We Care Trading Co., Inc.*, 67 Fed. Appx. 626, 630 (2d Cir. 2002) (affirming the jury's dilution verdict on grounds that "the jury's determination that the hang tag was famous and distinctive was not unreasonable" and "the substantial similarity of the two marks here coupled with the use of Coach's very distinctive hang tag shape amply justified the jury's verdict"). Although the Board did not specifically address these cases, we agree with Triumph that they are unrelated and irrelevant, particularly because: (1) the 1991 case did not involve a dilution claim; and (2) both cases focus on the hangtag feature on CSI's handbags, not on the alleged fame of the COACH mark generally.

Based on the foregoing, we agree with the Board that CSI failed to provide sufficient evidence of fame for dilution purposes. Absent a showing of fame, CSI's dilution claim fails, and we need not address the remaining statutory factors for dilution by blurring.

Before moving on, we pause to emphasize the fact-specific nature of our holding today. While the burden to show fame in the dilution context is high – and higher than that for likelihood of confusion purposes – it is not insurmountable. We do not hold that CSI could never establish the requisite level of fame for dilution purposes. We hold only that, on the record presented to it, the Board had substantial support for its conclusion that CSI's evidentiary showing was just too weak to do so here.

### D. Whether Triumph's Marks Were Registrable

As an alternative ground for opposition, CSI argued that Triumph's COACH mark is merely descriptive and thus not registrable under 15 U.S.C. § 1052(e). The Board

found that, although CSI had standing to oppose Triumph's applications on descriptiveness grounds, Triumph demonstrated that its COACH marks had acquired distinctiveness.

Both parties take issue with portions of the Board's decision on descriptiveness. For its part, Triumph argues that the Board incorrectly found that CSI had standing to oppose registration on descriptiveness grounds. In contrast, CSI argues that it had standing and that "there was no evidence in the record to support a finding that Triumph's descriptive 'Coach' marks have acquired distinctiveness." Appellant's Br. 19. We address the parties' arguments in turn.

### 1. Standing

Standing is a question of law that this court reviews *de novo*. Under Article III of the United States Constitution, a plaintiff must show a "case or controversy" between the parties to establish standing. *Ritchie v. Simpson*, 170 F.3d 1092, 1094 (Fed. Cir. 1999). The "case" and "controversy" restrictions do not, however, apply to matters before administrative agencies. *Id.* Instead, for an agency such as the PTO, standing is conferred by statute. Here, standing is conferred by Section 13 of the Lanham Act, which provides, in pertinent part, that "[a]ny person who believes that he would be damaged by the registration of a mark . . . may, upon payment of the prescribed fee, file an opposition in the Patent and Trademark Office, stating the grounds therefor." 15 U.S.C. § 1063(a). The purpose of the standing requirement is "to prevent litigation where there is no real controversy between the parties, where a plaintiff, petitioner or opposer, is no more than an intermeddler." *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 1028-29 (C.C.P.A. 1982).

In addition to meeting the broad requirements of Section 13, an opposer must satisfy two judicially-created standing requirements. *Ritchie*, 170 F.3d at 1095. Specifically, an opposer must show: (1) a "real interest" in the proceeding; and (2) a "reasonable basis" for believing that it would suffer damage if the mark is registered. *Id.* Under the "real interest" requirement, an opposer must have "a legitimate personal interest in the opposition." *Id.* With respect to the second inquiry, the opposer's belief of damage "must have a reasonable basis in fact." *Id.* at 1098 (citation and quotation omitted).

Here, the Board found that, "[b]ecause opposer's registrations are of record, opposer has established its standing." *Board Decision*, 96 U.S.P.Q.2d at 1604. Although this case is unusual because CSI asserted likelihood of confusion, dilution, and mere descriptiveness, without asserting that it has the right to use the mark descriptively, the Board found "no question that opposer has established a real interest in preventing the registration of applicant's mark." *Id.* at 1605. In reaching this decision, the Board noted that "standing and grounds may be related, but they are distinct inquiries." *Id.* (citation omitted).

On appeal, Triumph argues that: (1) CSI's only witness testified that it would not be harmed from the "alleged descriptive nature" of Triumph's mark;[9] (2) CSI

---

[9] During her deposition, Sadler testified as follows:

Q. You believe that a descriptive use of the word "Coach" by someone is going to cause your company harm?

A. No.

Q. So it is dilution and likelihood of confusion that would cause your company harm, correct?

"failed to establish that it uses the mark COACH in a descriptive fashion or in a manner to describe its goods"; and (3) because CSI does not have an interest in using the Triumph marks descriptively, it lacks standing to oppose Triumph's marks on descriptiveness grounds. Appellee's Br. 46-47. Triumph's arguments are not persuasive.

As the Board noted in its decision, this court has previously found that, "[o]nce standing is established, the opposer is entitled to rely on any of the grounds set forth in section 2 of the Lanham Act which negate applicant's right to its subject registration." *Jewelers Vigilance v. Ullenberg Corp.*, 823 F.2d 490, 493 (Fed. Cir. 1987) (citation omitted); *see also Enter. Rent-A-Car Co. v. Advantage Rent-A-Car, Inc.*, 330 F.3d 1333, 1345 (Fed. Cir. 2003) ("Once standing is established, in order to state a claim, an opposer must base its ground of opposition on a statutory claim found in the Lanham Act."); *see also Estate of Biro v. Bic Corp.*, 18 U.S.P.Q.2d 1382, 1385-86 (T.T.A.B. 1991) (noting that, once the opposer shows "a personal interest in the outcome of the case . . . the opposer may rely on any ground that negates applicant's right to the registration sought"). Accordingly, in this context, once an opposer meets the requirements for standing, it can rely on any of the statutory grounds for opposition set forth in 15 U.S.C. § 1052.

Triumph does not challenge CSI's standing to assert claims for likelihood of confusion and dilution, and in-

---

A.  Correct.

Mr. Zivin: Objection. Mischaracterization.

J.A. 3672: 4-13.  We do not view this testimony as an admission that registration of Triumph's marks would not harm CSI.

stead focuses its standing arguments solely on CSI's descriptiveness challenge. There is no question that CSI has a personal stake in the outcome of the opposition and has asserted it will be harmed by registration of Triumph's marks. Therefore, any theory that would prevent Triumph from registering its marks would necessarily prevent the alleged harm to CSI. Because CSI has established a real interest and reasonable basis for believing registration of Triumph's marks will cause harm in the form of likelihood of confusion or dilution, it also has standing to assert a claim on descriptiveness grounds.

## 2.   Mere Descriptiveness

Marks that are "merely descriptive" of goods and services are not entitled to protection. *In re Abcor Dev. Corp.*, 588 F.2d 811, 813 (C.C.P.A. 1978). A mark is merely descriptive "if it immediately conveys knowledge of a quality, feature, function, or characteristic of the goods or services with which it is used." *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 963 (Fed. Cir. 2007) ("*Bayer*") (citing *In re Gyulay*, 820 F.2d 1216, 1217 (Fed. Cir. 1987)). A mark may be merely descriptive "even if it does not describe the 'full scope and extent' of the applicant's goods or services." *In re Oppedahl & Larson LLP*, 373 F.3d 1171, 1173 (Fed. Cir. 2004) (citation omitted).

It is well-established that "[d]escriptiveness of a mark is not considered in the abstract." *Bayer*, 488 F.3d at 963-64. Instead, the mark must be "considered in relation to the particular goods for which registration is sought, the context in which it is being used, and the possible significance that the term would have to the average purchaser of the goods because of the manner of its use or intended use." *Id.* at 964. Evidence that a term is merely descriptive "may be obtained from any competent source, such as dictionaries, newspapers, or surveys." *Bayer*, 488 F.3d at

964 (quoting *In re Bed & Breakfast Registry*, 791 F.2d 157, 160 (Fed. Cir. 1986)). A determination that a mark is merely descriptive is a factual finding that this court reviews for substantial evidence. *Bayer*, 488 F.3d at 964.

The Board found that COACH is merely descriptive when used in connection with educational materials used to prepare students for standardized tests because it "immediately conveys to purchasers the purpose of the materials." *Board Decision*, 96 U.S.P.Q.2d at 1617. In support of this finding, the Board pointed to dictionary definitions of the word "coach," which include: (1) "a private tutor who prepares a student for an examination"; (2) "a person who trains an athlete"; and (3) "to give instruction or advice in the capacity of a coach; instruct." *Id.* at 1616-17. The Board also relied on evidence of third-party use of the term "coach." For example, CSI introduced forty-three titles of books and software incorporating the word "coach," including: "The Business Coach" and "My SAT Coach." Based on the evidence of record, the Board concluded that the word "coach" is "a personification of the act of instructing or tutoring for an examination." *Id.* at 1616-17.

Substantial evidence supports the Board's decision that Coach is merely descriptive. Specifically, we agree that the dictionary definitions in the record, coupled with evidence of third parties that use the term "coach" to describe services that are similar to those identified in Triumph's application, support the Board's descriptiveness finding.

### 3. Secondary Meaning

Although the Board found that Triumph's marks were merely descriptive when used in connection with its goods, it concluded that Triumph provided sufficient

evidence showing that its COACH marks had acquired secondary meaning through use in commerce.

It is well-established that a descriptive mark can be registered if it has acquired secondary meaning. Section 2(f) of the Lanham Act provides, in part, that:

> nothing herein shall prevent the registration of a mark used by the applicant which has become distinctive of the applicant's goods in commerce. The Director may accept as prima facie evidence that the mark has become distinctive, as used on or in connection with the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness is made.

15 U.S.C. § 1052(f).

To establish secondary meaning, or acquired distinctiveness, an applicant must show that "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *In re Dial-A-Mattress Operating Co.*, 240 F.3d 1341, 1347 (Fed. Cir. 2001) (citation omitted). To determine whether a mark has acquired secondary meaning, courts consider: advertising expenditures and sales success; length and exclusivity of use; unsolicited media coverage; copying of the mark by the defendant; and consumer studies. *In re Steelbuilding.com*, 415 F.3d 1293, 1300 (Fed. Cir. 2005). Acquired distinctiveness is a question of fact which is "reviewed under the clearly erroneous standard." *Yamaha Int'l Corp. v. Hoshino Gakki Co., Ltd.*, 840 F.2d 1572, 1581 (Fed. Cir. 1988).

As the Board noted, Triumph raised acquired distinctiveness as its sixth affirmative defense in its answer to

CSI's amended notice of opposition. Based on the record before it, the Board made the following factual findings:

- Triumph is the largest publisher of educational materials for preparing for standardized tests and COACH is its primary trademark;

- Between 2003-2008, Triumph's advertising expenditures quadrupled and exceeded six figures;

- Between 2003-2007, Triumph's revenues have reached seven figures;

- Triumph has been promoting COACH as the name of its series of books since at least 1989.

*Board Decision*, 96 U.S.P.Q.2d at 1617. CSI challenged Triumph's evidence on grounds that: (1) there was no direct evidence of consumer recognition; (2) Triumph introduced and relied upon self-serving, uncorroborated testimony from its Vice President of Marketing: Jane Fisher; (3) Triumph's sales success is not necessarily indicative of acquired distinctiveness; (4) Triumph's use has not been substantially exclusive; and (5) Triumph did not present evidence of media recognition. The Board rejected each of these arguments and found that Triumph met its burden of showing that its COACH marks have acquired distinctiveness.

First, the Board stated that, contrary to CSI's contention, Triumph was not required to introduce a consumer survey and that the Board could determine consumers' reactions to the mark based on inferences from the record. Next, the Board found that Ms. Fisher's testimony was subject to cross-examination and found her testimony – which dealt with Triumph's advertising expenditures and revenue between 2003 and 2008 – credible. The Board further found that Triumph's use of its COACH mark in connection with educational materials for preparing for

standardized tests "is, and has been, substantially exclusive." *Board Decision*, 96 U.S.P.Q.2d at 1619. And, the Board concluded that Triumph has been "promoting itself as the 'Coach' brand since 1989 through its references to 'Coach series,' 'Coach Books and Software,' and 'the Coach.'" *Id.* Based on the foregoing, the Board found Triumph established its affirmative defense of acquired distinctiveness.

On appeal, CSI argues that Triumph's sales figures are insufficient to prove secondary meaning and that Triumph's use of the COACH mark is not "substantially exclusive," particularly given that there was "evidence of 43 different book and software titles showing use of the designator 'Coach' for coaching materials." Appellant's Br. 53-54. CSI also argues that, in finding that Triumph has used its COACH marks "since 1989," the Board improperly relied on evidence it said it would not consider because it was not authenticated. Specifically, CSI argues that: (1) Triumph's witness, Ms. Fisher, lacked any personal knowledge of certain marketing documents because she was not working for Triumph at the time the materials allegedly were used; and (2) "review of the alleged brand since 1989 would show that Triumph did not seek to use 'Coach' as a 'brand' until Fall 2003." Appellant's Reply 14. We address CSI's arguments in turn.

With respect to the forty-three book and software titles not affiliated with Triumph that include the word "coach," the Board found no evidence in the record as to their sales and that most of the titles do not relate to educational materials for preparing for standardized tests. Although the Board found five titles of record that arguably relate to Triumph's subject matter – including "A Writer's Coach", "My SAT Coach", and "My Word Coach" – it dismissed those titles at least in part on

grounds that they were published *after* Triumph filed its applications in 2004. The Board cites no authority for its decision to disregard these titles based on their publication dates, and Triumph has offered none. Indeed, the Board has previously noted that "[a]cquired distinctiveness and buyer recognition is to be tested in an opposition proceeding as of the date the issue is under consideration. The filing date is not a cutoff for any evidence developing after that time." *Target Brands, Inc. v. Hughes*, 85 U.S.P.Q.2d 1676, 1681 (T.T.A.B. 2007) (citing *McCormick & Co. v. Summers*, 354 F.2d 668 (C.C.P.A. 1966); *Harsco Corp. v. Electrical Sciences, Inc.*, 9 U.S.P.Q.2d 1570, (T.T.A.B. 1988)). We conclude that the Board's failure to consider all pre-decision third-party use of the term "coach" for educational materials undermines its secondary meaning analysis and requires remand so that the Board can assess the extent to which those titles might cut against a claim of "substantially exclusive use."

With respect to Triumph's use of the COACH mark, the Board concluded that Triumph has been promoting itself as "the 'Coach' brand since 1989." *Board Decision*, 96 U.S.P.Q.2d at 1619. Triumph offered Ms. Fisher's testimony to authenticate advertising materials dating back to the early 1990s. Because Ms. Fisher did not begin working for Triumph until July 2003, CSI objected to her testimony "regarding any matters other than the identification of business records prior to July 2003 on the ground that she lack[ed] personal knowledge about applicant's business prior to that date." *Id.* at 1603. The Board sustained CSI's objection, stating that it would consider Ms. Fisher's testimony regarding pre-July 2003 matters "only for purposes of authenticating documents kept by applicant in the ordinary course of business." *Id.*

On appeal, CSI argues that: (1) "there was no testimony authenticating these documents as business records

of Triumph"; and (2) Ms. Fisher "had no personal knowledge of where, when, to whom and how many of the materials were distributed." Appellant's Br. 55 n.23. On these points, CSI is correct. Review of the relevant testimony reveals that Ms. Fisher identified certain catalogs, indicated that those catalogs were actually used to market and sell products, and testified as to when the catalogs were used. Nowhere is a foundation laid to establish that the catalogs identified actually were prepared and kept as business records of Triumph. Given the Board's ruling excluding testimony by Ms. Fisher about marketing activities of which she had no personal knowledge, moreover, there is no admissible testimony in the record regarding the actual use of the catalogs or the fact of marketing prior to 2003. Accordingly, on remand, the Board must address the weight, if any, to be given to pre-July 2003 documents in the absence of any testimony authenticating them or addressing their use. The Board must then assess whether these apparent gaps in Triumph's proofs impact the Board's determination that the mark was in continuous use during any relevant period.

Because the Board's evidentiary errors call into question the validity of its secondary meaning analysis, we vacate the Board's decision solely on its finding of acquired distinctiveness and remand for further proceedings.

## CONCLUSION

For the foregoing reasons, and because we find that CSI's remaining arguments are without merit, we affirm the Board's decision dismissing CSI's opposition on likelihood of confusion and dilution grounds. With respect to acquired distinctiveness, however, we vacate and remand for further proceedings consistent with this opinion.

**AFFIRMED-IN-PART, VACATED-IN-PART, REMANDED**