This Opinion Is a
Precedent of the TTAB

Mailed: May 8, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

———

Trademark Trial and Appeal Board

———

*New York Yankees Partnership*

*v.*

*IET Products and Services, Inc.*

———

Opposition No. 91189692

———

Mary L. Kevlin, Richard S. Mandel, and Maryann E. Licciardi of Cowan, Liebowitz
& Latman, P.C., for Opposer New York Yankees Partnership.

G. Mathew Lombard and Darren M. Geliebter of Lombard & Geliebter LLP,
for Applicant IET Products and Services, Inc.

———

Before Rogers, Chief Administrative Trademark Judge, Richey, Deputy Chief
Administrative Trademark Judge, and Bucher, Zervas, Cataldo, Ritchie, and
Hightower, Administrative Trademark Judges.

Opinion by Hightower, Administrative Trademark Judge:

IET Products and Services, Inc. ("Applicant") seeks to register three marks on

the Principal Register:

- "THE HOUSE THAT JUICE BUILT" (in standard characters) for T-
  shirts, baseball caps, hats, jackets and sweatshirts (as amended), in
  International Class 25;[1]

---

[1] Application Serial No. 77404369, filed February 22, 2008 for registration on the
Supplemental Register based on Applicant's allegation of a *bona fide* intention to use the
mark in commerce under Section 1(b) of the Trademark Act; amended to seek registration



- The designation shown at right for T-shirts, baseball caps, hats, jackets and sweatshirts, in International Class 25;[2] and

- THE HOUSE THAT JUICE BUILT (in standard characters) for mugs, in International Class 21.[3]

New York Yankees Partnership ("Opposer"), which the record shows is owner

of the New York Yankees Major League Baseball club, opposes

registration of the marks on the grounds that they are likely to

cause confusion with certain of its marks, including its top hat

logo design (shown at right) and THE HOUSE THAT RUTH



BUILT, pursuant to Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d); are

likely to cause dilution of its marks by blurring pursuant to Trademark Act Section

43(c), 15 U.S.C. § 1125(c); and falsely suggest an association with its New York

---

on the Principal Register. The quotation marks are part of the mark. Assignment of the application from Steven Lore to Applicant was recorded with the PTO's Assignment Branch on March 10, 2009 at Reel/Frame 3949/0441. The assignments of the three intent-to-use applications at issue include no reference to Applicant as a successor to Mr. Lore's business pursuant to Trademark Act Section 10(a)(1), 15 USC § 1060(a)(1). However, in view of the Board's decision, further inquiry into the validity of the assignments is not necessary.

[2] Application Serial No. 76691994, filed August 12, 2008 based on Applicant's allegation of a *bona fide* intention to use the mark in commerce under Section 1(b) of the Trademark Act. The description of the mark states: "The mark consists of a hat with white stars against a blue hat band, red and white stripes and a white rim, all bordered in black and a tuft of blue, all above a white syringe with a black dot within it and bordered in black, which is circled with a red universal prohibition symbol." Assignment of the application from Steven Lore to Applicant was recorded with the PTO's Assignment Branch on March 20, 2009 at Reel/Frame 3969/0777.

[3] Application Serial No. 77576227, filed September 23, 2008 based on Applicant's allegation of a *bona fide* intention to use the mark in commerce under Section 1(b) of the Trademark Act. Assignment of the application from Steven Lore to Applicant was recorded with the PTO's Assignment Branch on March 10, 2009 at Reel/Frame 3949/0441.

Yankees Major League Baseball club pursuant to Trademark Act Section 2(a), 15 U.S.C. § 1052(a). We sustain the opposition on the ground of dilution.

## I. Record

Pursuant to Trademark Rule 2.123(b), the parties stipulated that witness testimony would be submitted solely by declaration and without cross-examination. The parties otherwise reserved the right to assert any evidentiary objections to the testimony contained in any witness declaration on any basis other than the manner of its submission.[4]

Opposer made the following evidence of record:

- Declaration of Ethan Orlinsky, with Exhibits A-S.[5]

- Applicant's admissions in response to Opposer's requests for admissions and responses to Opposer's interrogatories.[6]

- Numerous printed publications and Internet printouts, many of them newspaper articles, relating to use of Opposer's asserted top hat logo design and HOUSE THAT RUTH BUILT marks; Opposer's participation in charitable, community, and anti-drug initiatives; and its sponsorship of beverages, including juice products.[7]

- Dictionary definitions of the term "juice."[8]

- Printouts from the electronic records of the U.S. Patent and Trademark Office ("PTO") of the registrations for Opposer's top hat logo design and THE HOUSE THAT RUTH BUILT marks, as well as the files of

---

[4] 43 TTABVUE. Record citations are to the Trademark Trial and Appeal Board docket history system. *See Turdin v. Trilobite, Ltd.*, 109 USPQ2d 1473, 1476 n.6 (TTAB 2014).

[5] 57-58 and 61-63 TTABVUE. Applicant has moved to strike ¶¶ 32-41 and exhibits J-R from the declaration. We have not relied on the material Applicant moves to strike and therefore do not address Applicant's motion.

[6] Opposer's First Notice of Reliance, Exhibits A and B, 49 TTABVUE at 5-85.

[7] Opposer's Second and Third Notices of Reliance, Exhibits A-D, 49 TTABVUE at 86 through 55 TTABVUE at 113, 56 TTABVUE, 59 TTABVUE through 60 TTABVUE at 55.

[8] Opposer's Second and Third Notices of Reliance, Exhibit E, 55 TTABVUE at 114-38, 60 TTABVUE at 56-72.

registrations of the marks THE HOUSE THAT GEORGE BUILT and THE HOUSE THAT JETER BUILT.[9]

Applicant introduced the following evidence:

- Declaration of Steven Lore, with Exhibits A-M.[10]

- Opposer's responses to Applicant's interrogatories and admissions in response to Applicant's requests for admission.[11]

- Printed publications and Internet printouts, including the 2007 Mitchell Report of an investigation into the illegal use of steroids and other performance enhancing substances by Major League Baseball players; and news articles mentioning the illegal use of steroids and other performance enhancing substances by Major League Baseball players, including players for Opposer's club.[12]

- Printouts from the electronic records of the PTO and Internet printouts relating to the third-party marks THE HOUSE THAT ROCK BUILT and THE HOUSE THAT FEAR BUILT, and records of the Secretary of the Commonwealth of Massachusetts relating to registration of the mark FENWAY THE HOUSE THAT PAPI BUILT.[13]

- Printouts from electronic PTO records and Internet printouts relating to other third-party HOUSE THAT _____ BUILT formative marks.[14]

- An Internet printout announcing that Alex Rodriguez of the New York Yankees would join the Taylor Hooton Foundation "to help fight youth steroid and other performance enhancing drug use," as well as news

---

[9] Opposer's Fourth and Rebuttal Notices of Reliance, Exhibits A-B, 60 TTABVUE at 74-112; 77 TTABVUE.

[10] 66-68 TTABVUE.

[11] Applicant's First Notice of Reliance, Exhibits 1-B through 1-D, 69 TTABVUE at 23-100. Applicant also submitted Opposer's responses to Applicant's document requests, but such responses generally are inadmissible unless they state that no responsive documents exist. *See United Global Media Group, Inc. v. Tseng*, 112 USPQ2d 1039, 1044 (TTAB 2014). Also, we have considered only Opposer's admissions, not denials, in response to Applicant's requests for admission. *See* Trademark Rule 2.120(j)(3)(i).

[12] Applicant's First Notice of Reliance, Exhibit 1-E, Second and Fourth Notices of Reliance, and Eighth Notice of Reliance, Exhibit 8-B, 69 TTABVUE at 101 through 71 TTABVUE, 72 TTABVUE at 182-220, 74 TTABVUE.

[13] Applicant's Fifth through Seventh Notices of Reliance, 72 TTABVUE at 2-180.

[14] Applicant's Tenth Notice of Reliance, 73 TTABVUE and 75 TTABVUE at 2-398.

stories relating to the same player's suspension for his role in a performance enhancing drug case.[15]

- A 2007 article on trademark parody from the website of Opposer's counsel.[16]

- Congressional testimony before the Committee on Government Reform, U.S. House of Representatives, on Senator Mitchell's report on the illegal use of steroids and other performance-enhancing substances by players in Major League Baseball.[17]

## II. Standing

Standing is a threshold issue that must be proven by the plaintiff in every *inter partes* case. *See Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023, 1025 (Fed. Cir. 1999). Although neither party addressed standing, Opposer's standing is established with respect to its likelihood of confusion and dilution claims by its registrations for its pleaded common-law marks, its top hat logo design and THE HOUSE THAT RUTH BUILT, which the record shows to be valid and subsisting, and owned by Opposer.[18] *See, e.g., Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000). If a plaintiff can show standing on one ground, it has the right to assert any other grounds in an opposition or cancellation proceeding. *See Corporacion Habanos SA v. Rodriguez*, 99 USPQ2d 1873, 1877 (TTAB 2011).

---

[15] Exhibit 8-A to Applicant's Eighth Notice of Reliance, 72 TTABVUE at 221-23, and Applicant's Eleventh Notice of Reliance, 75 TTABVUE at 400-65.

[16] Applicant's Ninth Notice of Reliance, 72 TTABVUE at 226-59.

[17] Applicant's Third Notice of Reliance, 76 TTABVUE.

[18] Orlinsky Decl. at ¶ 4 & Exhibit A (printouts of Office records showing status and title of Registration Nos. 1032767, 2575644, 3320068, 3320069, 3320070), ¶ 5 & Exhibit B (printouts of Office records for Registration Nos. 2884499, 3363883, 3600235). 57 TTABVUE at 8-9, 28-63.

## III. Dilution by Blurring

Dilution by blurring is "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." Trademark Act Section 43(c)(2)(B). Dilution may be likely "regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." Section 43(c)(1).

Our primary reviewing court, the Court of Appeals for the Federal Circuit, has set forth the following four elements a plaintiff must prove in a Board proceeding in order to prevail on a claim of dilution by blurring:

(1) the plaintiff "owns a famous mark that is distinctive;

(2) the defendant is using a mark in commerce that allegedly dilutes the plaintiff's famous mark;

(3) the defendant's use of its mark began after the plaintiff's mark became famous; and

(4) the defendant's use of its mark is likely to cause dilution by blurring or by tarnishment."

*Coach Servs. Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1723-24 (Fed. Cir. 2012) ("*Coach*").

### A. Fame for Dilution

A threshold question in a federal dilution claim is whether the plaintiff's mark is "famous." *Coach*, 101 USPQ2d at 1724. A mark is famous for dilution purposes "if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." Trademark Act Section 43(c)(2)(A). There are four non-exclusive factors to consider when determining whether a mark is famous:

    i.  The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

    ii.  The amount, volume, and geographic extent of sales of goods or services offered under the mark.

    iii.  The extent of actual recognition of the mark.

    iv.  Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

*Id*. While fame for likelihood of confusion is a matter of degree along a continuum, fame for dilution "is an either/or proposition" – it either exists or does not. *Coach*, 101 USPQ2d at 1724 (quoting *Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1694 (Fed. Cir. 2005)). Accordingly, a mark can acquire "sufficient public recognition and renown to be famous for purposes of likelihood of confusion without meeting the more stringent requirement for dilution fame." *Coach*, 101 USPQ2d at 1724 (quoting *7-Eleven Inc. v. Wechsler*, 83 USPQ2d 1715, 1722 (TTAB 2007)).

    1.  Fame of Opposer's Top Hat Logo Design

Opposer relies on its common-law rights in a variety of design marks incorporating a red-white-and-blue top hat resting on the end of a baseball bat, as depicted in its opening brief:



[19]

---

[19] Opposer's Brief at 11, 80 TTABVUE at 19.



(Collectively, Opposer nominates the above designs "Opposer's Top Hat marks.") Among these designs, we, like the parties, focus our analysis on what Opposer characterizes as its "Top Hat Primary Logo" (shown at right).[20]

Applicant does not dispute that Opposer's top hat design mark is inherently distinctive and acknowledged during discovery some degree of fame for the mark. Applicant admitted that "Opposer's Top Hat Marks are famous as used in connection with Opposer's baseball team uniforms and apparel."[21] However, we note that neither the request for admission nor the response thereto differentiated fame for dilution purposes from fame for likelihood of confusion purposes. *Coach*, 101 USPQ2d at 1724 ("Fame for likelihood of confusion and fame for dilution are distinct concepts, and dilution fame requires a more stringent showing."). We agree with Applicant's acknowledgment of distinctiveness. The record evidence bearing on fame supports Applicant's admission that Opposer's top hat design mark is famous and is sufficient to overcome the limitations in that admission, so that we also find the mark famous for dilution purposes, as discussed *infra*.

Opposer offered no direct evidence regarding the extent of actual recognition of the mark, the third non-exclusive fame factor. However, Opposer offered substantial evidence relating to the first two fame factors: the duration, extent, and geographic reach of advertising and publicity of the mark, and the amount, volume, and

---

[20] *Id*. at 10, 80 TTABVUE at 18; Orlinsky Decl. at ¶¶ 4, 10, 57 TTABVUE at 8, 10.

[21] Applicant's Response to Opposer's Request for Admission No. 5, 49 TTABVUE at 16-17. "Opposer's Top Hat Marks" is a term defined in Opposer's discovery requests.

geographic extent of sales of goods or services offered under the mark. *Cf. Bose Corp. v. QSC Audio Prods. Inc.*, 293 F.3d 1367, 63 USPQ2d 1303, 1308 (Fed. Cir. 2002) (noting, in likelihood of confusion case, that "virtually all of our precedent attributing fame to a mark has done so through indirect evidence of the extent to which a mark has earned fame in the consumer marketplace").

First, Opposer's witness, Ethan Orlinsky, Senior Vice President and General Counsel of Opposer's licensing agent Major League Baseball Properties, Inc., testified that Opposer has used the top hat design mark for more than 50 years[22] and has used the mark on apparel for more than 40 years.[23] Orlinsky testified that Opposer's Top Hat Marks are displayed at Opposer's Yankee Stadium ballpark during Yankees home games, which have been broadcast nationwide on national networks such as ESPN, FOX, CBS, NBC, ABC, and TBS, as well as on the Major League Baseball national cable channel, MLB Network; nationwide through DirecTV; on the Yankees Entertainment and Sports (YES) Network, a cable TV channel that broadcasts in New York, New Jersey, Connecticut, and parts of Pennsylvania; and by subscription through official websites <mlb.com> and <newyork.yankees.mlb.com>.[24] Orlinsky also testified that Opposer's top hat design mark is featured on the Yankee Club's Facebook page, and that its Top Hat Marks have been used in connection with score lists and channel listings, including for Sirius XM Satellite Radio services.[25]

---

[22] Orlinsky Decl. ¶ 10, 57 TTABVUE at 10.

[23] *Id.* ¶ 16, 57 TTABVUE at 15.

[24] *Id.* ¶ 12, 57 TTABVUE at 11-12.

[25] *Id.*, 57 TTABVUE at 12-13.

Orlinsky testified that: "Since 1995, wholesale sales in the United States of Yankees Club-licensed products bearing trademarks associated with, promoting or identifying the Yankees Club, including, without limitation, Opposer's Top Hat Marks, have exceeded $1.5 billion."[26] Opposer specified neither how much of that $1.5 billion in sales was from the time frame most relevant for dilution – that is, before Applicant filed its applications in 2008 – nor what proportion of those sales were for goods bearing its Top Hat Marks. *See Bd. of Regents, Univ. of Tex. Sys. v. S. Ill. Miners, LLC*, 110 USPQ2d 1182, 1194 (TTAB 2014). However, Opposer did provide examples of the range of goods on which its Top Hat Marks have appeared, including goods offered before 2008,[27] as well as testimony that those marks have been used in connection with a variety of local and national sponsorships, among them Pepsi-Cola, Tropicana, Nike, McDonald's, Dunkin' Donuts, AT&T, MasterCard, Kellogg's, Delta Air Lines, Gillette and Bank of America.[28]

Turning to the fourth non-exclusive fame factor, the design has been registered on the Principal Register since at least 1976. Opposer's registrations cover baseball-related services and a variety of collateral goods, including drinking cups and items of apparel.[29]

On the basis of Applicant's admission, and on the record evidence, we find that Opposer's top hat design mark is famous for dilution purposes.

---

[26] *Id.* ¶ 14, 57 TTABVUE at 13-14.

[27] *See id.*, Exhibit E, 58 TTABVUE at 313-16, 366-80; Exhibit F, 62 TTABVUE at 1-46, 80-233.

[28] *Id.* ¶ 17, 57 TTABVUE at 15.

[29] Registration Nos. 1032767, 2575644, 3320068, 3320069, and 3320070, issued between 1976 and 2007. 60 TTABVUE at 77-102.

2. Fame of THE HOUSE THAT RUTH BUILT Word Mark

In paragraph 2 of its Amended Answer, filed September 21, 2011, Applicant admitted the allegations in Opposer's Amended Consolidated Notice of Opposition ¶ 2, as follows:

> Since 1923 and until this MAJOR LEAGUE BASEBALL season, the [New York Yankees Major League Baseball] Club played its home games at YANKEE STADIUM ballpark. The YANKEE STADIUM ballpark was built shortly after legendary player and slugging sensation Babe Ruth joined the Club in 1920. Because it was widely recognized that Babe Ruth's tremendous drawing power made the new stadium possible, the stadium immediately became known as THE HOUSE THAT RUTH BUILT. THE HOUSE THAT RUTH BUILT stadium has become the stage for the twenty-six (26) WORLD SERIES titles earned by the Club, and is one of the most famous and well-known of all the baseball stadiums used by the thirty MAJOR LEAGUE BASEBALL clubs.

Thus, Applicant admits both that Opposer's baseball stadium had been known as THE HOUSE THAT RUTH BUILT since 1923, and that it "is one of the most famous and well-known of all the baseball stadiums" in Major League Baseball.

Applicant made of record a Wikipedia.org entry on Yankee Stadium which states that the stadium's nickname is "The House That Ruth Built."[30] Applicant's President testified that he was "aware of the use of **THE HOUSE THAT RUTH BUILT** by the public, press and media for nearly a century to refer to the original Yankee Stadium – the building, not Opposer – which was demolished in 2008, but not as a trademark by Opposer or any other party."[31] Applicant also made the following admission during discovery:

---

[30] Lore Decl., Exhibit F, 67 TTABVUE at 88.

[31] *Id.* ¶ 54, 66 TTABVUE at 9.

Request No. 4: Admit that Opposer's THE HOUSE THAT RUTH BUILT Marks are famous.

Response: Applicant **ADMITS** that the phrase "The House That Ruth Built," as used by the press and public, is famous. However, Applicant **DENIES** that Opposer's THE HOUSE THAT RUTH BUILT trademarks are famous.[32]

The distinction Applicant makes – between use by the public of THE HOUSE THAT RUTH BUILT designation and use by Opposer as a mark – is not meaningful to our analysis. The first factor for assessing fame for dilution is the "duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner *or third parties*." Trademark Act Section 43(c)(2)(i) (emphasis added).

We have found that in certain circumstances a nickname or a trade name for a product or service may acquire trademark significance when the public has come to know and use it as such "even if the company itself has made no use of the term." *American Stock Exch., Inc. v. American Express Co.*, 207 USPQ 356, 364 (TTAB 1980) (AMEXCO protectable abbreviation for American Express Company). *See also Big Blue Prods. Inc. v. Int'l Bus. Machs. Corp.*, 19 USPQ2d 1072 (TTAB 1991) (BIG BLUE for IBM); *Peiper v. Playboy Enters., Inc.*, 179 USPQ 318, 320 (TTAB 1973) (BUNNY CLUB for Playboy clubs). Here, in addition to the conceded widespread third-party use, Opposer used THE HOUSE THAT RUTH BUILT mark in connection with licensed merchandise, and also registered that mark, before Applicant filed its applications.[33]

---

[32] Applicant's Amended Response to Opposer's Requests for Admission, 49 TTABVUE at 28.

[33] Orlinsky Decl. ¶ 21, 57 TTABVUE at 16-17, and Exhibit I, 63 TTABVUE at 67-68.

The record is consistent with Applicant's purportedly limited admission that the phrase THE HOUSE THAT RUTH BUILT, as used by the public and the press, is famous. The evidence demonstrates that Opposer's use of its stadium, which Applicant admits had been known by the nickname THE HOUSE THAT RUTH BUILT since the 1920s,[34] has resulted in widespread recognition of that mark in association with Opposer's baseball services. Opposer's witness testified that attendance at the Yankees Club's games played at its home stadium has totaled over 63 million since 1990.[35]

Opposer introduced 25 full-text articles from newspapers around the United States published during the years 2000 through 2007 that contained both the terms YANKEES and THE HOUSE THAT RUTH BUILT.[36] For example, a July 7, 2007 story in the *Fort Worth (Texas) Star Telegram* listed Yankee Stadium among the "Seven Wonders of the Sports World." The story referred to the stadium as "The House That Ruth Built" and stated that: "Prompted partly by the Yankees' string of world championships, Yankee Stadium became one of the world's most famous stadiums and a sought-out venue for marquee events in other sports as well as non-sporting events."[37] Opposer also introduced printouts of excerpts of more than 2,600 stories resulting from searches of the LexisNexis database for articles containing both YANKEES and THE HOUSE THAT RUTH BUILT for the years 2000 through

---

[34] Amended Consolidated Notice of Opposition ¶ 2, 29 TTABVUE at 6; Amended Answer ¶ 2, 31 TTABVUE at 3.

[35] Orlinsky Decl. ¶ 9, 57 TTABVUE at 10. Presumably, old and new stadiums are included.

[36] Opposer's Second Notice of Reliance, Exhibit A, 49 TTABVUE at 86-145.

[37] *Id.*, 49 TTABVUE at 141-43.

2007.[38] This is strong evidence not only that the public and press have come to view THE HOUSE THAT RUTH BUILT as an indicator of source for Opposer (*i.e.*, a mark), but also that it is a famous mark. *See, e.g., Bose Corp. v. QSC Audio Prods. Inc.*, 293 F.3d 1367, 63 USPQ2d 1303, 1309 (Fed. Cir. 2002) (discussing extensive media coverage as confirmatory context for fame); *NASDAQ Stock Market Inc. v. Antartica S.r.l.*, 69 USPQ2d 1718, 1737 (TTAB 2003) (finding mark famous based in part on frequent media coverage); *Toro Co. v. ToroHead Inc.*, 61 USPQ2d 1164, 1181 (TTAB 2001) (listing intense media attention among three examples of evidence that show "the transformation of a term into a truly famous mark").

Finally, Opposer owns three registrations on the Principal Register for THE HOUSE THAT RUTH BUILT for clothing, posters, figurines, and "entertainment services in the form of professional baseball games[;] providing sports information by means of digital transmission."[39] Two of these registrations issued before Applicant's filing dates, and all three applications were filed before the opposed applications. Opposer also introduced testimony that it has used THE HOUSE THAT RUTH BUILT mark in connection with "a variety of licensed merchandise, such as clothing (e.g., shirts, T-shirts, caps, hats, pullovers, sweatshirts), novelty items, posters, figurines, toys and games and sports memorabilia, and as a service

---

[38] *Id.*, Exhibit B, 51 TTABVUE at 474 through 54 TTABVUE at 128.

[39] Registration Nos. 2884499 (filed June 12, 1998, issued Sept. 14, 2004); 3600235 (filed June 30, 2005, issued March 31, 2009); 3363883 (filed June 30, 2005, issued Jan. 1, 2008), 60 TTABVUE at 104-11.

mark in connection with entertainment services, including professional baseball games, and providing information in the field of sports."[40]

Based on Applicant's admissions and the record evidence, we find that Opposer's word mark THE HOUSE THAT RUTH BUILT is famous for dilution purposes.

### B.     Applicant's Use of Its Marks in Commerce

The second dilution element Opposer must establish is that Applicant is using its allegedly diluting mark in commerce. Under the 1999 amendments to the Federal Trademark Dilution Act, we held that an application based on intent to use a mark in commerce under Trademark Act Section 1(b) satisfied the commerce requirement. *Toro Co.*, 61 USPQ2d at 1174. The Trademark Dilution Revision Act of 2006 (TDRA) does not change this result. *See Chanel, Inc. v. Makarczyk*, 110 USPQ2d 2013, 2023 (TTAB 2014) (holding that an opposer asserting a dilution claim in a Board proceeding against an application based on an allegation of actual use in commerce pursuant to Section 1(a) may prove applicant's use in commerce by direct evidence or rely on the application filing date as the date of constructive use).

We therefore find that Opposer has satisfied the second dilution element as to all three applications.

### C.     Fame of Opposer's Marks Before Applicant's First Use

Under the third dilution factor, Opposer must prove that its marks became famous before the filing date of Applicant's intent-to-use applications. *See Coach,* 101 USPQ2d at 1725 (citing *Toro Co.*, 61 USPQ2d at 1174). The three applications

---

[40] Orlinsky Decl. ¶ 21, 57 TTABVUE at 16-17.

at issue were filed in 2008. We have analyzed the evidence of fame as it pertains to the years before 2008. Based on the record evidence and Applicant's admissions discussed *supra,* we find that both Opposer's top hat design mark and THE HOUSE THAT RUTH BUILT word mark became famous before the filing dates of the respective applications.

D. Whether Applicant's Marks Are Likely To Cause Dilution

The final element of our dilution analysis assesses whether Applicant's marks are likely to dilute Opposer's marks. As noted *supra,* dilution by blurring occurs when a substantial percentage of consumers, on seeing the junior party's use of a mark on its goods, are immediately reminded of the famous mark and associate the junior party's use with the owner of the famous mark, even if they do not believe that the goods come from the famous mark's owner. *UMG Recordings Inc. v. Mattel Inc.*, 100 USPQ2d 1868, 1888 (TTAB 2011) (citing *Toro Co.,* 61 USPQ2d at 1183).

The Trademark Act enumerates six non-exhaustive factors a tribunal may consider in determining whether a mark is likely to cause dilution by blurring:

(i) The degree of similarity between the mark or trade name and the famous mark.

(ii) The degree of inherent or acquired distinctiveness of the famous mark.

(iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.

(iv) The degree of recognition of the famous mark.

(v) Whether the user of the mark or trade name intended to create an association with the famous mark.

(vi) Any actual association between the mark or trade name and the famous mark.

Section 43(c)(B)(i)-(vi).

We will address these factors as they apply to each of Applicant's marks in turn.

1. Applicant's Top Hat and Syringe Design

(i) The degree of similarity between Applicant's mark and the famous mark.

The Board noted in *National Pork Board v. Supreme Lobster & Seafood Co.*, 96 USPQ2d 1479, 1497 (TTAB 2010), that,

> after finding in the affirmative on the question of pre-existing fame, an important question in a dilution case is whether the two involved marks are sufficiently similar to trigger consumers to conjure up a famous mark when confronted with the second mark.

While we are not conducting a Section 2(d) likelihood of confusion analysis under this factor for dilution by blurring, we still consider the degree of similarity or dissimilarity of the marks in their entireties as to appearance, connotation, and commercial impression. *Research in Motion Ltd. v. Defining Presence Marketing Group Inc.*, 102 USPQ2d 1187, 1198 (TTAB 2012) ("*Research in Motion*"). We consider the marks in terms of whether they are sufficiently similar in their overall commercial impressions that the required association exists. *Nike Inc. v. Maher*, 100 USPQ2d 1018, 1030 (TTAB 2011).

Applicant's design mark is shown on the left below, while Opposer's registered top hat design mark is shown in the center. Opposer also presented evidence that the top hat portion of its mark is generally depicted in a red-white-and-blue color scheme, as shown on the right:[41]

---

[41] Orlinsky Decl. ¶ 29, 57 TTABVUE at 18-19.

  

The overall similarity between the two design marks is immediately apparent. Each incorporates a circle and features a similarly patterned top hat resting atop a slender object leaning to the right.

We acknowledge that there are significant differences between the marks, the most obvious being that Applicant's mark replaces Opposer's bat with a syringe and its round baseball design with the round universal prohibition symbol. In addition, Applicant's top hat is slightly different in shape, bigger relative to the rest of the design, and extends outside the circle, while Opposer's top hat lies within the circle. Opposer's primary logo also includes the word "Yankees." Nonetheless, when considered in their entireties, we find that the appearance of the marks overall is sufficiently similar that Applicant's mark will "trigger consumers to conjure up" Opposer's famous mark. That is, consumers encountering Applicant's mark will immediately be reminded of Opposer's famous top hat design mark and associate the two.

   (ii) The degree of inherent or acquired distinctiveness of the famous mark.

Particularly in light of the presence of the top hat design, which is at most suggestive of Opposer's distinctive "Yankees" team name, Opposer's design mark is

inherently distinctive. Even if the mark is not viewed as inherently distinctive, we found above that the mark is famous, which necessarily subsumes a finding that the mark has high acquired distinctiveness. This factor favors a likelihood of dilution.

(iii)  The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.

There is no evidence in the record of any third-party use of a design mark similar to Opposer's top hat logo, as Applicant acknowledges.[42] Therefore, we find that Opposer is engaging in substantially exclusive use of its top hat design mark. This factor also favors a likelihood of dilution.

(iv)  The degree of recognition of the famous mark.

There is no direct evidence regarding the degree of consumer recognition of Opposer's top hat design mark. Although we have found Opposer's design mark to be famous, based on Applicant's admission and record evidence, we do not view the record to contain sufficient evidence from which we could infer the degree of recognition of this mark. *Cf. UMG Recordings Inc.*, 100 USPQ2d at 1887, 1889 (inferring substantial extent of recognition of famous mark). We therefore find this factor to be neutral.

(v)  Whether the user of the mark or trade name intended to create an association with the famous mark.

Applicant makes clear that it views its design mark to succeed as a parody precisely because it creates an association with Opposer's design mark. Applicant's President, Steven Lore, testified as follows:[43]

---

[42] *See* Applicant's Brief at 28, 82 TTABVUE at 35.

[43] Lore Decl. at 9, 66 TTABVUE at 13.

## THE PARODIC NATURE OF APPLICANT'S MARKS

95. In addition to the facts recited above, Applicant's Syringe Design indicates two things: that it is the original, but also that it is not the original, and is instead a parody.

96. The inclusion of a Top Hat in Applicant's Syringe Mark conveys that it is the original, *i.e.*, Opposer's Top Hat Mark; however, the inclusion of the representations of a syringe and the international prohibition symbol simultaneously convey that it is <u>not</u> the original and, rather, is a parody.

97. Likewise, the red, white and blue colors, which are claimed, convey Applicant's Mark is the original, but the inclusion of the representations of a syringe and the international prohibition symbol simultaneously convey that it is <u>not</u> the original and, rather, is a parody.

98. The other differences mentioned above also convey that it is <u>not</u> the original and, rather, is a parody.

99. The specific placement of the Top Hat outside (on top) of the international prohibition symbol and the extension of the syringe beyond the border of the international prohibition symbol simultaneously convey that it is <u>not</u> the original and, rather, is a parody.

In the same vein, Applicant argues in its brief that

> even if the Board concludes that Opposer's mark is famous and even if the Board concludes that consumers are immediately reminded of the famous mark and associate the junior party's use with owner [sic] of the famous mark even if they do not believe that the goods come from the famous mark's owner, 15 U.S.C. § 1125(c)(3)(A)(ii) mandates that Applicant's parody is non-actionable.[44]

Applicant is referring to one of the dilution "exclusions" provided in Section 43(c)(3) of the Trademark Act, which reads as follows:

> (3) Exclusions.--The following shall not be actionable as dilution by blurring or dilution by tarnishment under this subsection:
>
> (A) Any fair use, including a nominative or descriptive fair use, or facilitation of such fair use, of a famous mark by another person **other than as a designation of source for the person's own goods or services**, including use in connection with--

---

[44] Applicant's Brief at 30-31, 82 TTABVUE at 37-38.

> > (i) advertising or promotion that permits consumers to compare goods or services; or
> >
> > (ii) identifying and parodying, criticizing, or commenting upon the famous mark owner or the goods or services of the famous mark owner.
>
> (B) All forms of news reporting and news commentary.
>
> (C) Any noncommercial use of a mark.

(emphasis added).

Applicant's argument ignores the language of Section 43(c)(3)(A) in bold print *supra*, which limits the "fair use" exclusion as defined in the statute to use of a famous mark "other than as a designation of source for the person's own goods or services" (Section 43(c)(3)(A)). "Noncommercial" use also is excluded. (Section 43(c)(3)(C)). To obtain federal registration, an applicant's use of the applied-for matter must be as a designation of source – *i.e.*, as a mark – and commercial – *i.e.*, used in commerce. *See* Trademark Act Sections 1, 2, 17, 18, and 45, 15 U.S.C. §§ 1051, 1052, 1067, 1068, and 1127. This proceeding is before the Board because Applicant is not seeking merely to make ornamental, expressive, or noncommercial use of its marks, but because Applicant has applied to register its trademarks as designations of the ***source*** of Applicant's own T-shirts, baseball caps, hats, jackets, sweatshirts, and mugs. The fair use exclusion is typically inapplicable when registration is sought, and it does not apply here.[45] *See Research in Motion*, 102 USPQ2d at 1200.

---

[45] The legislative history relating to this provision of the TDRA addresses not registration but civil actions, that is, "the threat of an injunction for mere likelihood of tarnishment" and "a separate exemption from a dilution cause of action for parody, comment and criticism." H.R. REP. NO. 109-23, at 25 (2005), *as reprinted in* 2006 U.S.C.C.A.N. 1091.

On the facts before us, we find that the record evidence of Applicant's intent to create an association with Opposer's famous mark weighs in favor of a likelihood of dilution.[46]

> (vi) Any actual association between Applicant's mark and the famous mark.

There is no evidence of any actual association between Opposer's marks and Applicant's. However, the applications were filed on an intent-to-use basis, and the record shows that Applicant has sold only 22 shirts bearing its marks.[47] Thus, there has been a limited opportunity for the public to make any actual association between the parties' design marks. We find this factor to be neutral.

Conclusion as to Dilution by Applicant's Top Hat and Syringe Design

Dilution by blurring occurs when a substantial percentage of consumers, on seeing the junior party's mark on its goods, are immediately reminded of the famous mark and associate the junior party's mark with the owner of the famous mark, even if they do not believe that the goods emanate from the famous mark's owner. All of the six factors we have considered weigh in favor of a likelihood of dilution to varying degrees except the fourth and sixth, which are neutral.

Moreover, although the dilution doctrine was designed to provide a remedy where the goods or services involved were neither competitive nor necessarily related, "courts have observed that the closer the products are to one another [in the marketplace], the greater the likelihood of both confusion and dilution." *Toro,* 61

---

[46] Applicant's assertion of parody is discussed further in the conclusion as to dilution.

[47] Applicant's Amended Response to Opposer's Interrogatory No. 6, 49 TTABVUE at 70-72.

USPQ2d at 1184 n.20 (quotation omitted). Here, the parties' goods are in-part identical and otherwise highly similar or related.

Finally, in its amended answer, Applicant asserts as an affirmative defense that its marks are parodies "and, as such, there exists no likelihood of confusion between Applicant's marks and Opposer's pleaded marks." Although Applicant did not specifically address dilution in pleading this defense, as noted *supra*, Applicant argued in its brief that its marks are not diluting because they are parodies.[48]

In *Research in Motion*, we stated that the Board would assess an alleged parody "as part of the circumstances to be considered for determining whether the [opposer] has made out a claim for dilution by blurring." 102 USPQ2d at 1200. In assessing the impact of the alleged parody in *Research in Motion*, we followed the Fourth Circuit's decision in *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC,* 507 F.3d 252, 84 USPQ2d 1969 (4th Cir. 2007) ("*Louis Vuitton*"), a case applying the parody defense to use of the mark "Chewy Vuiton" for dog toys, which the plaintiff alleged diluted its LOUIS VUITTON mark for luxury goods. No other federal appellate court, to our knowledge, has adopted the Fourth Circuit's interpretation that the possible parody effect of a defendant's mark should be considered in determining whether a plaintiff has proved dilution by blurring. *See Starbucks Corp. v. Wolfe's Borough Coffee Inc.*, 588 F.3d 97, 92 USPQ2d 1769, 1778 (2d Cir. 2009) (declining to adopt or reject *Louis Vuitton* parody holding).

We take this opportunity to modify our prior suggestion in *Research in Motion* that an alleged parody should be considered as part of our dilution analysis even

---

[48] *See* Applicant's Brief at 14, 29-31, 82 TTABVUE at 21, 36-38.

when parody does not provide a safe harbor for a defendant. We now choose to not consider the parody defense as part of the assessment of the dilution claim, because, as discussed *supra*, a mark that identifies source – which it must for registration – will not concurrently qualify for a statutory exclusion to a dilution claim. Stated another way, when an applicant's mark is registrable, because it is being used in commerce to indicate source, such use is not a noncommercial use or fair use. Thus, given the circumstances generally presented by opposition and cancellation proceedings based on allegations of dilution, we find it virtually impossible to conceive of a situation where a parody defense to a dilution claim can succeed in a case before the Board. Certainly this is not such a case. In this opposition proceeding Applicant has, by filing its application, affirmatively sworn that its Top Hat and Syringe Design will serve as an indicator of source and that it has a *bona fide* intention to use the mark in commerce.[49]

On the evidence before us, we find that Applicant's registration of its design mark for items of clothing would impair the distinctiveness of Opposer's top hat design marks and would not constitute a non-source-indicating fair use parody.

We conclude that Applicant's design is likely to dilute the distinctive quality of Opposer's top hat design mark by blurring.

### 2. THE HOUSE THAT JUICE BUILT Word Marks

As noted *supra*, Applicant has applied to register THE HOUSE THAT JUICE BUILT both with and without quotation marks. Applicant does not contend that the presence or absence of quotation marks alters the commercial impression of these

---

[49] In fact, the record establishes that Applicant has already sold T-shirts and mugs.

marks. We find that Applicant's word marks make essentially the same commercial impression and analyze them together. *Cf. In re G. D. Searle & Co.*, 360 F.2d 650, 149 USPQ 619, 623 (CCPA 1963) (holding common descriptive term "the pill" generic despite addition of quotation marks); *In re Vanilla Gorilla L.P.*, 80 USPQ2d 1637, 1639 (TTAB 2006) (noting that "the addition of punctuation marks to a descriptive term would not ordinarily change the term into a non-descriptive one").

      (i)    The degree of similarity between Applicant's mark and
the famous mark.

Opposer's word mark is THE HOUSE THAT RUTH BUILT. Applicant's mark is THE HOUSE THAT JUICE BUILT. The marks are identical except for the fourth word in each, RUTH versus JUICE. These two words are somewhat similar aurally; each consists of a single syllable with the second letter "U" and is pronounced with a central "ū" sound preceded and followed by consonant sounds.

Obviously, the words RUTH and JUICE have different meanings, and the marks convey different connotations as a result. RUTH is a proper noun referring in Opposer's mark to baseball player Babe Ruth. JUICE is a common noun with multiple meanings, used in Applicant's mark to refer to performance-enhancing drugs, as Applicant explained in its discovery responses:[50]

---

[50] Opposer's Response to Applicant's Request for Admission No. 10, 49 TTABVUE at 19.

Request No. 10

Admit that the word "juice" is used to refer to the consumption of alcohol or anabolic steroids.

**Response**: Applicant **ADMITS** that "juice," as used in Applicant's Mark, refers to the consumption of anabolic steroids and/or performance-enhancing substances or to anabolic steroids and/performance-enhancing substances themselves, but **DENIES** that "juice," as used in Applicant's Mark, refers to the consumption of alcohol or alcohol itself. However, the term "juice" may also refer to other things, including but not limited to, street credibility, respect, interesting gossip, or fruit juice (*e.g.*, orange juice or apple juice).

Nonetheless, Applicant makes clear that it selected its THE HOUSE THAT JUICE BUILT mark to evoke Opposer's famous mark for parodic purposes. Applicant's President, Steven Lore, testified that its marks "play off of the idea that steroids are a player on MLB teams and the Yankees."[51] Similarly, Applicant states in its brief that:

> The evidence of record establishes that the Applicant's Marks are **irreverent versions of Opposer's marks** which succeed in instantly conveying that it is an expressive and jocular reference to the newsworthy and public issue of the use of performance enhancing drugs ("PEDs") by Major League Baseball ("MLB") players – including players affiliated with Opposer's baseball club. (emphasis added) (footnote omitted).[52]

Although Applicant argues later in its brief that consumers encountering THE HOUSE THAT JUICE BUILT mark may think of third-party marks before

---

[51] Lore Decl. at 6 ¶ 70, 66 TTABVUE at 10.

[52] Applicant's Brief at 14, 82 TTABVUE at 21.

Opposer's,[53] we find that Applicant selected a mark sufficiently similar to "trigger consumers to conjure up" Opposer's famous THE HOUSE THAT RUTH BUILT mark.

> (ii) The degree of inherent or acquired distinctiveness of the famous mark.

Opposer's phrase, at worst for Opposer, is merely suggestive of baseball services and therefore inherently distinctive. *See Wal-Mart Stores Inc. v. Samara Bros. Inc.*, 529 US 205, 54 USPQ2d 1065, 1068 (2000) (noting that suggestive marks are inherently distinctive). Opposer has established that its famous mark also has a high degree of acquired distinctiveness. This dilution factor favors Opposer.

> (iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.

Applicant contends that Opposer cannot prevail on its dilution claim because its word mark was diluted before Opposer registered it by the use and registration of the following seven marks: THE HOUSE THAT ROCK BUILT, THE HOUSE THAT FRIED CHICKEN BUILT, THE HOUSE THAT JACK BUILT, WELCOME TO THE HOUSE THAT SEAFOOD BUILT, THE HOUSE THAT LOVE BUILT, THE HOUSE THAT FAME BUILT, and "THE HOUSE THAT SERVICE BUILT." In support of its contention, Applicant submitted printouts of the registration files of those marks and minimal Internet printouts and screenshots displaying those marks.[54]

---

[53] *Id.* at 45-46, 82 TTABVUE at 52-53.

[54] 72 TTABVUE at 5-165, 73 TTABVUE, and 75 TTABVUE at 2-398.

Third-party registrations are not evidence of use. *Nike Inc. v. WNBA Enters. LLC*, 85 USPQ2d 1187, 1200 (TTAB 2007). Applicant's Internet evidence is probative that the websites exist and that the public may have been exposed to them and therefore may be aware of the information contained in them. *See Mag Instrument Inc. v. Brinkmann Corp.*, 96 USPQ2d 1701, 1708 (TTAB 2010), *aff'd unpublished*, No. 11-1052, 11-1053 (Fed. Cir. Nov. 9, 2011). However, this evidence is of limited probative value to our dilution analysis because Applicant introduced no evidence as to the extent of the use and promotion by third parties of their HOUSE THAT _____ BUILT marks. "Without such evidence, we cannot assess whether third-party use has been so widespread as to have had any impact on consumer perceptions." *7-Eleven Inc.*, 83 USPQ2d at 1729.

A limited amount of third-party use is insufficient to defeat a showing of substantially exclusive use. *McDonald's Corp. v. McSweet, LLC*, 112 USPQ2d 1268, 1289 (TTAB 2014). Based on the evidence of record, we find this factor to be neutral.

(iv)  The degree of recognition of the famous mark.

As discussed *supra*, THE HOUSE THAT RUTH BUILT has been in use in association with Opposer's services for nearly a century. The record shows that the mark had appeared thousands of times in the U.S. media before 2008. This is strong evidence that the mark is widely recognized. This factor weighs in favor of dilution.

(v) Whether the user of the mark or trade name intended to create an association with the famous mark.

Applicant admits that its word mark also is intended to create an association with Opposer, albeit more obliquely than in its admission with respect to its intent in adopting its design mark. Applicant's President, Steven Lore, testified that:[55]

> Applicant's THE HOUSE THAT JUICE BUILT mark expressively, cleverly and parodically suggests – as has been widely speculated in the press, media and public – that the use of steroids, human growth hormones, and other PEDs made the recent success of the Yankees possible.

Applicant's intention to create an association with THE HOUSE THAT RUTH BUILT mark favors Opposer.

(vi) Any actual association between the mark or trade name and the famous mark.

There is no evidence of any actual association between Applicant's and Opposer's marks. However, because Applicant has sold only 22 shirts bearing its marks and no mugs,[56] there has been a limited opportunity for the public to form any actual association between the parties' word marks. We find this factor to be neutral.

Conclusion as to Dilution by Applicant's THE HOUSE THAT JUICE BUILT Marks

Four of the six factors we have considered weigh in favor of a likelihood of dilution, while the third and last are neutral. We also note that Applicant's goods (T-shirts, baseball caps, hats, jackets, sweatshirts, and mugs) are in-part identical and otherwise highly similar or related to Opposer's goods. We find that Applicant's registration and use of its word marks to designate the source of these goods would

---

[55] Lore Decl. ¶ 73, 66 TTABVUE at 11.

[56] Applicant's Amended Response to Opposer's Interrogatory No. 6, 49 TTABVUE at 70-72.

impair the distinctiveness of Opposer's word mark. We apply the logic of our discussion of parody *supra* to this mark as well. *See Research in Motion Ltd.*, 102 USPQ2d at 1200.

Viewing the evidence as a whole, we conclude that Applicant's THE HOUSE THAT JUICE BUILT marks, with and without quotation marks, are likely to dilute the distinctive quality of Opposer's word mark THE HOUSE THAT RUTH BUILT.

*Decision:* The opposition is sustained as to all three applications pursuant to Opposer's dilution by blurring claim under Section 43(c) of the Trademark Act. Because we have found for Opposer on its dilution claims, we need not reach the merits of its claims under Sections 2(a) and 2(d) of the Trademark Act. *See Multisorb Techs., Inc. v. Pactiv Corp.*, 109 USPQ2d 1170 (TTAB 2013).