This Opinion is a
Precedent of the TTAB

Hearing: July 25, 2017                                Mailed: March 31, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*In re Guild Mortgage Company*

————

Serial No. 86709944

————

Joel L. Incorvaia and G. Ehrich Lenz of Incorvaia & Associates,
    for Guild Mortgage Company.

Verna B. Ririe, Trademark Examining Attorney, Law Office 104,
    Zachary Cromer, Managing Attorney.

————

Before Bergsman, Ritchie, and Greenbaum,
    Administrative Trademark Judges.

Opinion by Ritchie, Administrative Trademark Judge:

Guild Mortgage Company ("Applicant") seeks registration on the Principal Register of the mark GUILD MORTGAGE COMPANY, and design, shown below, for "mortgage banking services, namely, origination, acquisition, servicing, securitization and brokerage of mortgage loans," in International Class 36, and disclaiming the exclusive right to "MORTGAGE COMPANY" apart from the mark as

shown:[1]



The Trademark Examining Attorney refused registration of Applicant's mark under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), on the ground that Applicant's mark, when applied to the identified services, so resembles the previously registered mark, GUILD INVESTMENT MANAGEMENT,[2] in standard character format, for "investment advisory services," in International Class 36, and disclaiming the exclusive right to "INVESTMENT MANAGEMENT" apart from the mark as shown, as to be likely to cause confusion, mistake, or to deceive.

When the refusal was made final, Applicant filed this appeal. After full briefing and oral argument, the Board issued a decision on July 28, 2017, affirming the refusal to register. Applicant appealed to the U.S. Court of Appeals for the Federal Circuit (the "Federal Circuit"), which issued a decision on January 14, 2019, vacating and remanding the decision "for further proceedings consistent with [its] opinion." *In re*

---

[1] Application Serial No. 86709944 was filed on July 30, 2015, under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), claiming dates of first use and first use in commerce on January 28, 2009. The application contains the following description of the mark: The mark consists of the name Guild Mortgage Company with three lines shooting out above the letters I and L. Color is not claimed as a feature of the mark

[2] Registration No. 3657486 issued July 21, 2009. Renewed.

*Guild Mortg. Co.,* 912 F.3d 1376, 129 USPQ2d 1160, 1164 (Fed. Cir. 2019). In particular, the Federal Circuit stated:

> The Board erred by failing to address Guild's argument and evidence related to *DuPont* factor 8, which examines the "length of time during and conditions under which there has been concurrent use without evidence of actual confusion."

*Id.* at 1162.

The appeal is thus before us again. The case is submitted on the record and original briefing. In accordance with the instructions of the Federal Circuit, we proceed with our decision on remand.

## I. Likelihood of Confusion

Our determination of the issue of likelihood of confusion is based on an analysis of all the probative facts in evidence that are relevant to the factors set forth in *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). *See also In re Majestic Distilling Co., Inc.*, 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods and/or services. *See Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24 (CCPA 1976). *See also In re Dixie Rests. Inc.*, 105 F.3d 1405, 41 USPQ2d 1531 (Fed. Cir. 1997). We consider the *du Pont* factors for which there are arguments and evidence. *In re Guild Mortg. Co.*, 129 USPQ2d at 1163.

A. The Marks

We consider and compare the appearance, sound, connotation and commercial impression of the marks in their entireties. *Palm Bay Imps. Inc. v. Veuve Clicquot*

*Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005). In comparing the marks, we are mindful that the test is not whether the marks can be distinguished when subjected to a side-by-side comparison, but rather whether the marks are sufficiently similar in terms of their overall commercial impression so that confusion as to the source of the services offered under the respective marks is likely to result. *Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 127 USPQ2d 1797, 1801 (Fed. Cir. 2018) (quoting *Coach Servs. Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012)); *see also Midwestern Pet Foods, Inc. v. Societe des Produits Nestle S.A.*, 685 F.3d 1046, 103 USPQ2d 1435, 1440 (Fed. Cir. 2012); *San Fernando Elec. Mfg. Co. v. JFD Elecs. Components Corp.*, 565 F.2d 683, 196 USPQ 1, 3 (CCPA 1977); *Spoons Rests. Inc. v. Morrison Inc.*, 23 USPQ2d 1735, 1741 (TTAB 1991), *aff'd mem.*, No. 92-1086 (Fed. Cir. June 5, 1992).

The mark in the cited registration is GUILD INVESTMENT MANAGEMENT, in standard characters, where the term "INVESTMENT MANAGEMENT" is generic or descriptive, and is disclaimed. Applicant's mark is GUILD MORTGAGE COMPANY, and design, , where the term "MORTGAGE COMPANY" is descriptive and disclaimed. While the marks in their entireties have obvious differences in sight and sound, they also have clear similarities in commercial impression. We consider each mark in its entirety. There is nevertheless nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided that our ultimate conclusion rests upon a comparison of the marks in their

entireties. *In re Nat'l Data Corp.*, 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985) ("Indeed, this type of analysis appears to be unavoidable.").

While we note that Applicant's mark contains a design element, we generally give less weight to the style and design elements of a mark than to the wording, because it is the wording that would be used by consumers to call for or request the services. *See In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1911 (Fed. Cir. 2012). Moreover, with respect to Applicant's mark, the design is not so distinctive as to distinguish Applicant's mark from the registered mark. Due to its large size and prominent placement, the term "GUILD" is the most visually striking element of Applicant's mark. We thus find the term "GUILD" to be dominant in both marks. In this regard, evidence of record indicates that both Applicant and Registrant refer to their marks by the shortened term "Guild."[3]

Applicant argues that the shared term "GUILD" "has different connotations as it is used" by Applicant and by Registrant.[4] To this end, Applicant argues that the term "GUILD" in the cited registration refers to the last name of Registrant's founder. Applicant submitted evidence from Registrant's website inviting consumers to "Meet the Team" and noting that Chief Investment Officer Monty Guild founded Guild Investment Management in 1971.[5] While consumers exposed to this website may

---

[3] See Registrant's website, attached to Applicant's March 23, 2016 Response to Office Action, at 28 ("About Guild"), and Declaration of Mary Ann McGarry, attached to Applicant's March 23, 2016 Response to Office Action, at 22 ("Guild"). Applicant further refers to itself in its appeal and reply briefs as simply "GUILD." *See* 4 TTABVUE 2, and 7 TTABVUE 2.

[4] 4 TTABVUE 11.

[5] Attached to Applicant's March 23, 2016 Response to Office Action, at 32.

perceive the term GUILD as the founder's surname, the term is also a recognized word with a dictionary definition. In this regard, we take judicial notice of the relevant dictionary definition of the word "GUILD" as referring to "An association of people with similar interests or pursuits" and whose synonyms include "institution," "institute," and "consortium."[6] Considering this dictionary definition, we are not convinced that consumers encountering the term in Registrant's mark would perceive it as a surname. Rather, we find that the connotation and commercial impression of Registrant's mark is likely to be perceived somewhat suggestively as referring to a "guild" or business group that offers the identified services related to "investment management." Likewise, in Applicant's mark, the connotation and commercial impression is likely to be of a "guild" or business group that offers "mortgage" services, such as the identified "mortgage banking services."

Applicant asks us to consider the alleged conceptual weakness of the term GUILD in our analysis of the first *du Pont* factor, which requires us to consider the "similarity or dissimilarity of the marks in their entireties."[7] We agree that it is appropriate to do so here, since, as discussed herein, an analysis of the similarity between marks

---

[6] Merriam-Webster.com. The Board may take judicial notice of dictionary definitions, including definitions or entries from references that are the electronic equivalent of a print reference work. *See Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imp. Co.*, 213 USPQ 594, (TTAB 1982) *aff'd*, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983) (dictionary definitions); *In re Red Bull GmbH*, 78 USPQ2d 1375, 1377 (TTAB 2006) (online dictionaries that exist in printed format or regular fixed editions).

[7] 4 TTABVUE 3, 8-15; 7 TTABVUE 6-7, citing *inter alia, Palm Bay Imports,* 73 USPQ2d at 1689. Applicant has not submitted any evidence of third-party use of the term GUILD, but rather focuses its argument on the effect of the third-party registrations. Applicant has thus not invoked the sixth *du Pont* factor regarding the "number and nature of similar marks in use on similar goods."

may include an analysis of the conceptual strength or weakness of the component terms and of the cited mark as a whole. *See Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1675 (Fed. Cir. 2015) (finding that "marks that are descriptive or highly suggestive are entitled to a narrower scope of protection" which is taken into account in determining the similarity or dissimilarity of the marks as a whole, in particular as to connotation and commercial impression).

In this regard, Applicant submitted a declaration from its counsel, G. Ehrich Lenz, stating:

> At the time I searched the TESS system for trademark registrations that contained the word "Guild," the TESS system indicated that there were 315 registered trademarks containing the word 'Guild' in some form. Exhibits 12 through 31 are a representative example of the use of trademarks containing the word "Guild" in conjunction with the sale of a variety of different goods and services in a variety of different industries.[8]

With the declaration, Applicant submitted 20 printouts of third-party registrations, only one of which identifies similar services in International Class 36.[9] With the Final Office Action, the Examining Attorney submitted into the record this same registration, along with five others, for a total of six third-party registrations, owned

---

[8] Attached to Applicant's March 23, 2016 Response to Office Action, at 176.

[9] Attached to Applicant's March 23, 2016 Response to Office Action, at 12-31. We note that Applicant refers in its brief to its evidence as supporting that "Guild" is "used widely for a variety of different goods and services." 4 TTABVUE 23. We thus consider the relevant evidence with regard to Applicant's argument that the term "Guild" is "weak." *Id.* To the extent Applicant may have intended to reference the ninth *du Pont* factor, there is no evidence as to "[t]he variety of goods on which" Registrant's mark is used.

by five different entities, with services in International Class 36, and with wording

in the mark that contains the term "GUILD":[10]

| MARK | REG. NO. | SERVICES |
|---|---|---|
| BROKERS GUILD | 3658667 | ". . . arranging for real estate financing for others; . . ." |
| | 3658668 | ". . . arranging real estate financing for others . . ." |
| | 3021392 | ". . . providing financial assistance to orchestras, musicians, conductors, teachers, and guest artists" |
| LIGHTHOUSE GUILD | 4782688 | "charitable fundraising . . ." |
| NATIONAL COUNCIL OF URBAN LEAGUE GUILDS | 4181195 | "charitable fund raising" |
| ALLIED ARTS GUILD | 3311944 | "rental of shopping center space for artists' studios, shops and restaurants" |

---

[10] Attached to May 2, 2016 Final Office Action, at 41-58. The Examining Attorney apparently submitted these third-party registrations in support of the argument that the services identified by Applicant and Registrant are similar, without specific regard to the shared term "Guild." Although the registrations were submitted by the Examining Attorney, Applicant referred to them in its reply brief at 7 TTABVUE 6. Our rules indicate that evidence in a Board proceeding may be cited by any party for any permissible purpose. *See* 37 CFR § 2.122(a) ("When evidence has been made of record by one party in accordance with these rules, it may be referred to by any party for any purpose permitted by the Federal Rules of Evidence."). We find it appropriate to clarify that in an ex parte proceeding, as well, evidence properly made of record may be cited by either the Examining Attorney or by the Applicant for any permissible purpose.

We observe that evidence of third-party registrations is relevant to "show the sense in which . . . a mark is used in ordinary parlance." *Juice Generation,* 115 USPQ2d at 1675, citing J. Thomas McCarthy, 2 MCCARTHY ON TRADEMARK AND UNFAIR COMPETITION § 11:90 (4th ed. 2015); *see also Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 116 USPQ2d 1129, 1136 (Fed. Cir. 2015). The record here contains only six third-party registrations, of which only two identify real-estate financing services, and another identifies other financing services. Indeed, Applicant argues that the term is "arbitrary" in its own mark.[11]

As noted above, we take judicial notice of "GUILD" as a word with a dictionary definition. In this regard, while the term "GUILD" may serve as a surname, and may otherwise have some suggestive significance with regard to its dictionary definition, there is insufficient evidence that it has specific significance to consumers with regard to Registrant's "investment advisory services," such that the term is conceptually weak, and that consumers would therefore find the marks as a whole to be dissimilar.

Rather, we find Applicant's mark to be similar in connotation and commercial impression to the mark in the cited registration. We further note that while we do not find the mark in the cited registration to be particularly weak, even weak marks

---

[11] 4 TTABVUE 12. Meanwhile, in her declaration, while asserting that the term "Guild" has "no particular meaning or affiliation at all," Applicant's President and CEO, Ms. McGarry, notes nevertheless that, "The term 'Guild' in the mark 'GUILD MORTGAGE COMPANY' was originally intended to indicate an affiliation with American Housing Guild."

are entitled to a presumption of validity under Section 7(b) of the Trademark Act, 15 U.S.C. § 1057(b), and to protection against registration of a mark likely to cause confusion. *See King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).

Thus we find that when considered in their entireties, the similarities of the marks, as to their connotations and overall commercial impressions, outweigh differences in sight and sound, and the first *du Pont* factor favors finding a likelihood of confusion.

B.  The Services

We consider next the relatedness of the services. The cited registration identifies "investment advisory services." Applicant identifies "mortgage banking services, namely, origination, acquisition, servicing, securitization and brokerage of mortgage loans." We look to see if the services are of a type that consumers will believe emanate from a common source. In this regard, the Examining Attorney submitted copies of about a dozen use-based, third-party registrations that include mortgage banking services, as identified in the application on the one hand, and investment advisory services, as identified in the cited registration, on the other hand. Copies of use-based, third-party registrations may help establish that the services are of a type which may emanate from a single source. *See In re RiseSmart, Inc.,* 104 USPQ2d 1931, 1934 (TTAB 2012)*; citing In re Albert Trostel & Sons Co.*, 29 USPQ2d 1783, 1785 (TTAB 1993). Furthermore, at least four of the registrations identify very specifically the "mortgage banking services, namely, origination, acquisition, servicing,

securitization and brokerage of mortgage loans," as identified by Applicant, and "investment advisory services" as identified by Registrant. These include ANDROSCOGGIN SMARTER BANKING (Registration No. 4801120);[12] WE HELP PEOPLE, BUSINESSES, AND OUR COMMUNITIES. (Registration No. 4785000);[13] FREEDOM BUSINESS (Registration No. 4724919);[14] and FSF and design (Registration No. 4917776).[15]

Applicant argues that these third-party registrations are not probative for two reasons. First, Applicant argues that they are not probative because the services offered by Registrant in this case may be narrowly defined as "**discretionary** management services" being offered by Registrant to "high net worth individuals and investment firms."[16] Second, Applicant argues that they are not probative because the referenced third-party registrations are owned by banks, and the services listed therein include not only the services offered by Applicant and Registrant but also an array of other banking services. As to the first argument, it is axiomatic that we must base our analysis on a review of the identifications themselves, and we must not consider possible more restrictive actual use in the marketplace. *See Stone Lion Capital Partners, LP v. Lion Capital LLP*, 746 F.3d 1317, 110 USPQ2d 1157, 1162 (Fed. Cir. 2014) ("It was proper, however, for the Board to focus on the application

---

[12] Owned by Androscoggin Savings Bank DBA Androscoggin Savings Bank Corporation Maine, attached to November 13, 2015 Office Action, at 27.

[13] Owned by Alpine Bancorporation, Inc., attached to November 13, 2015 Office Action, at 36.

[14] Owned by Freedom Portfolio Services Corporation Texas, attached to May 2, 2016 Final Office Action, at 85-87.

[15] Owned by First State Financial, Inc., attached to May 2, 2016 Final Office Action, at 104-105.

[16] 4 TTABVUE 18 (underscore in original).

and registrations rather than on real-world conditions"), *citing Octocom Sys. Inc. v. Houston Comput. Servs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783 (Fed. Cir. 1990). The cited registration is not limited to any particular subset of investment advisory services.

As to the second argument, there is no evidence that the services listed in these third-party registrations are over-inclusive, nor does Applicant argue that they extend beyond the banking and financial industry such as to render them non-probative in our analysis as to consumer perceptions of what services would derive from a common source for purposes of this proceeding.

The second *du Pont* factor favors a finding of likelihood of confusion.

C. The Channels of Trade and Classes of Customers

With regard to the channels of trade, in the absence of specific limitations in the cited registration and the application, we must presume that Applicant's mortgage banking services and Registrant's investment advisory services will travel in all normal and usual channels of trade and methods of distribution for those services. *See Stone Lion Capital*, 110 USPQ2d at 1161-1162; *see also In re Linkvest S.A.*, 24 USPQ2d 1716, 1716 (TTAB 1992) (because there are no limitations as to channels of trade or classes of purchasers in either the application or the cited registration, it is presumed that the services in the registration and the application move in all channels of trade normal for those services, and that the services are available to all classes of purchasers for the listed services). In this regard, we find that the same consumers may seek mortgage banking and investment advisory services so that both

services are rendered to some of the same individuals and are offered in some of the same channels of trade. *See, e.g., Citigroup Inc. v. Capital City Bank Grp., Inc.*, 637 F.3d 1344, 98 USPQ2d 1253, 1261 (Fed. Cir. 2011) ("Because the parties' trade channels and classes of consumers are unrestricted, the third and fourth *DuPont* factors also favor Citigroup."). In further support of this, the Examining Attorney submitted web pages from third parties that offer both mortgage banking and investment advisory services, including Wells Fargo, Bank of America, Chase, Alpine Bank, and BB&T.[17]

The channels of trade and classes of customers thus favor a finding of likelihood of confusion.

D. The Degree of Consumer Care

Although the customer classes overlap, Applicant urges us to consider the consumer sophistication and degree of purchaser care likely to be exercised when consumers seek the services at issue in this proceeding, given Applicant's argument that Registrant caters to "high net worth" individuals. We emphasize again that we are bound by the identifications, which are not limited to particular investors or investment amounts. *See, e.g., Bose Corp. v. QSC Audio Prods., Inc.*, 293 F.3d 1367, 63 USPQ2d 1303, 1310-11 (Fed. Cir. 2002); *Canadian Imperial Bank of Commerce v. Wells Fargo Bank, Nat'l Ass'n*, 811 F.2d 1490, 1 USPQ2d 1813, 1816 (Fed. Cir. 1987), citing *CBS, Inc. v. Morrow,* 708 F.2d 1579, 218 USPQ 198 (Fed. Cir. 1983); *Feed Serv.*

---

[17] Attached to November 13, 2015 Office Action, at 45-57, and May 2, 2016 Final Office Action, at 10-33.

*Corp. v. FS Servs., Inc.*, 432 F.2d 478, 167 USPQ 407, 408 (CCPA 1970). Furthermore, we must make our determination based on the least sophisticated consumer. *Stone Lion Capital*, 110 USPQ2d at 1163 (likelihood-of-confusion decision must be based "on the least sophisticated potential purchasers"). Nevertheless, we expect that consumers may exercise a certain degree of care in investing money, if not perhaps in seeking a mortgage loan for which they simply wish to get funded.

Thus, consumer sophistication weighs slightly against finding a likelihood of confusion.

E.  Concurrent Use of the Marks

Applicant asks us to consider evidence of record regarding the eighth *du Pont* factor. In its brief, Applicant included the following sentence in support of this argument:

> Further, the fact that there has been **over 40 years** of concurrent use of GUILD and Registrant's marks with no evidence of actual confusion demonstrates that there is no possibility of confusion in the minds of consumers between GUILD and Registrant's marks.[18]

As noted above, on appeal, the Federal Circuit stated the following:

> The Board erred by failing to address Guild's argument and evidence related to *DuPont* factor 8, which examines the "length of time during and conditions under which there has been concurrent use without evidence of actual confusion."

*In re Guild Mortg.*, 129 USPQ2d at 1162.

The court further stated that:

> Guild nonetheless presented evidence of concurrent use of the two marks for a particularly long period of time – over 40 years – in which

---

[18] 4 TTABVUE 23 (underscore in original).

the two businesses operated in the same geographic market – southern California – without any evidence of actual confusion. Further, the Board has found that Guild's and Registrant's services are similar and move in the same channels of trade, which is relevant when assessing whether the absence of actual confusion is indicative of the likelihood of confusion.

*Id.* at 1164.

As noted above, our analysis as to the second, third, and fourth *du Pont* factors, discussing the similarity or dissimilarity of the services, channels of trade, and relevant consumers, is based, as dictated by precedent from the Federal Circuit, on the identifications **as set forth** in the application and the cited registration. *See Stone Lion*, 110 USPQ2d at 1162. As such, we may not consider, in assessing these *du Pont* factors, evidence of how Applicant and Registrant are **actually rendering** their services in the marketplace. *Id.*

The eighth *du Pont* factor, by contrast – "[t]he length of time during and conditions under which there has been concurrent use without evidence of actual confusion," *see du Pont*, 177 USPQ at 567 – requires us to look at **actual market conditions**, to the extent there is evidence of such conditions of record. In this regard, we consider all of the evidence of record that may be relevant to the eighth *du Pont* factor. Applicant submitted a declaration from its President and CEO, Mary Ann McGarry, who attested that Applicant has used its mark since 1960.[19] Ms. McGarry further attested that while Applicant began its use in San Diego, California, Applicant has since "expanded its mortgage lending business nationwide." In particular, Applicant

---

[19] Declaration of Mary Ann McGarry, attached to March 23, 2016 Response to Office Action, at 22 (Para. 1).

is "currently licensed in 46 states and the District of Columbia and has in excess of 250 offices and satellites."[20] Applicant did not, however, provide any specifics as to its use of its mark in any particular geographical location.

The cited registration resulted from an application filed on January 12, 2009, and issued on July 21, 2009. The owner is listed as Guild Investment Management, Inc., with an address in Los Angeles, California. Applicant submitted into the record evidence regarding Registrant's business, including web pages, which Applicant's attorney states are from Registrant's website, as well as printouts from the website of the California Secretary of State and from the United States Security and Exchange Commission.[21] Evidence from the California Secretary of State indicates that Registrant registered its business in 1978, with its address listed in Los Angeles, California.[22] The evidence from the SEC indicates that Registrant is organized under the laws of the State of California, and that it has also provided "notice filings" in five other states, Connecticut, Florida, New Hampshire, New Mexico, and Texas.[23] Registrant's brochure refers to correspondence with investors "by email," but does not provide any specifics as to where those investors are located.[24] Registrant's website indicates that it was founded in 1971, and that "For Over 40 years, Guild has been

[20] *Id.*

[21] Declaration of G. Ehrich Lenz, attached to March 23, 2016 Response to Office Action, at 174, and exhibits cited therein.

[22] Attached to March 23, 2016 Response to Office Action, at 34-35.

[23] Attached to March 23, 2016 Response to Office Action, at 69-70, 75.

[24] Attached to March 23, 2016 Response to Office Action, at 39-40, 51.

managing successfully client's portfolios in the global markets [sic]."[25] The website does not indicate any specifics as to the location of Registrant's clients or about how they interact with Registrant.

In summary, the evidence demonstrates that Applicant has been doing business in San Diego, California for over forty years, and from a more recent (unspecified) date, nationwide. The evidence further indicates that Registrant has been conducting business from its principal location in Los Angeles, California for much of that time. While both Applicant and Registrant apparently conduct business in various states, the evidence does not indicate any specific geographical areas of overlap between the consumer markets for the business conducted by Applicant and the business conducted by Registrant.

While the evidence indicates that both Applicant and Registrant conduct business in California, there is no indication that they operate in the same city or metropolitan area. We take judicial notice that the distance between the respective addresses of Applicant and Registrant is 126.3 miles.[26] We further take judicial notice of the substantial size of the populations of their respective cities. The City of San Diego, where Applicant is located, is listed as having a population of 1,426,976.[27] The City

---

[25] Attached to March 23, 2016 Response to Office Action, at 28.

[26] *See* Maps.RandMcNally.com, which shows the driving distance between Applicant's address of record, 5898 Copley Dr., San Diego, California, 92111 and Registrant's address of record, 12400 Wilshire Blvd., Los Angeles, California, 90025, as 126.3 miles. *See In re Consol. Specialty Rests. Inc.*, 71 USPQ2d 1921, 1927 (TTAB 2004) (judicial notice taken of Merriam-Webster's Geographical Dictionary and The Columbia Gazetteer of North America).

[27] *See* Census.gov, which shows the population of the City of San Diego as of July 1, 2018, to be estimated at 1,426,976. *See In re Highlights for Children, Inc.*, 118 USPQ2d 1268, 1271 n.7 (TTAB 2016) (the Board may take judicial notice of the U.S. Census Report).

of Los Angeles, where Registrant is located, is listed as having a population of 3,990,456.[28] We find, therefore, that Applicant and Registrant are separated both by a noticeable driving distance, and by a separate consumer base, and that Applicant has not presented evidence to the contrary. In particular, while both San Diego and Los Angeles may be generally characterized as being located in "Southern California," there is no evidence of record that there is any actual, meaningful overlap in the markets for the services offered by Applicant and those offered by Registrant in these two distinct, non-adjacent cities. Indeed, Applicant argued repeatedly in its appeal brief and reply brief that, without regard to the identifications as stated, the consumers of Registrant's and Applicant's services are quite different.[29]

Finally, in this ex parte context, there has been no opportunity to hear from Registrant about whether it is aware of any reported instances of confusion. We therefore are getting only half the story. *See, e.g.*, *In re Opus One, Inc.*, 60 USPQ2d 1812, 1817 (TTAB 2001) ("The fact that an applicant in an ex parte case is unaware of any instances of actual confusion is generally entitled to little probative weight in the likelihood of confusion analysis, inasmuch as the Board in such cases generally has no way to know whether the registrant likewise is unaware of any instances of

---

[28] *See* Census.gov, which shows the population of the City of Los Angeles as of July 1, 2018, to be estimated at 3,990,456.

[29] *See* 4 TTABVUE 21 (arguing "the **degree of overlap** of consumers exposed to GUILD and REGISTRANT'S respective services is minimal.") (underscore in original); *see also* 7 TTABVUE 11 (arguing "[t]he different trade channels used by GUILD and Registrant reflect their vastly different businesses and the nature of their respective clients.").

actual confusion, nor is it usually possible to determine that there has been any significant opportunity for actual confusion to have occurred.") (citations omitted); *In re Wilson*, 57 USPQ2d 1863, 1869 (TTAB 2001) ("[I]nasmuch as we have heard from neither registrant nor the Highland Orange Association in this appeal, we cannot conclude that, in fact, no instances of actual confusion ever occurred."); *In re Cruising World, Inc.*, 219 USPQ 757, 758 (TTAB 1983) ("Concerning the lack of actual confusion argument, in an ex parte hearing where only the applicant's position is expressed and there is no way to assess what the experience of the registrant has been, it is impossible to conclude that actual confusion has never occurred."). This constraint inherent in the ex parte context necessarily limits the potential probative value of evidence bearing on the eighth *du Pont* factor, compared with an inter partes proceeding, where the registrant has an opportunity to present argument and evidence in response.

Thus, while we note again the evidence that both Applicant and Registrant conduct their business in California and possibly in some of the same other states nationwide, there is a lack of evidence that **in the actual marketplace**, the **same** consumers have been exposed to **both** marks for the respective services, such that we could make a finding as to the "length of time during and conditions under which there has been concurrent use without evidence of actual confusion." Upon full consideration, we find the eighth *du Pont* factor to be neutral.

## II.    Conclusion

On balance, after considering all of the arguments and evidence of record as they pertain to the relevant *du Pont* factors, we find that the marks have the same dominant term, and, when considered in their entireties, are substantially similar in commercial impression, particularly in light of our finding that the mark in the cited registration has not been shown to be conceptually weak. We further find that the services, as recited in the application and registration, are related. In the absence of any stated restrictions in the identifications, they must be presumed to travel through some of the same channels of trade to some of the same consumers.

In this regard, although we must consider the wording of the identifications **as set forth** by Applicant and Registrant, respectively, in our analysis of the second, third and fourth *du Pont* factors, in our analysis of the eighth *du Pont* factor by contrast, we must instead consider only evidence of real-world, marketplace use. Considering all of the evidence in record, and considering publicly available facts regarding the distance between the respective locations of Applicant and Registrant, and of the size of their separate, respective consumer markets, there simply is insufficient evidence to convince us that the eighth *du Pont* factor, which considers the "length of time during and conditions under which there has been concurrent use without evidence of actual confusion," would weigh against finding a likelihood of confusion, much less outweigh the other factors that weigh in favor of finding a likelihood of confusion.

Although some of the consumers would be likely to exercise a somewhat increased degree of care, we find, on balance, that there is a likelihood of confusion between

- 21 -

Applicant's mark , and the mark in the cited registration, GUILD

INVESTMENT MANAGEMENT, for the identified services.

**Decision**: The refusal to register is affirmed under Section 2(d).